**UNITED STATES of America, Appellee,**

v.

**Dean THOMAS, also known as "Dino," Defendant,**

**Jaime A. Davidson, also known as "Stringer," also known as "Andrew Brown," also known as "Jaime Davidson," Juan A. Morales, also known as "Pedro," also known as "Antonio," Robert Lawrence, also known as "Robert Julian," also known as "Bam–Bam," Lenworth Parke, also known as "Lenwood Parker," also known as "Glen," also known as "Paul Scott," and Gary Anthony Stewart, also known as "Poppy," Defendants–Appellants.**

**Nos. 1221 thru 1225, Dockets 93–1416 thru 93–1419 and 93–1527.**

United States Court of Appeals, Second Circuit.

Argued May 9, 1994.

Original Filing Date July 26, 1994.

Corrected Filing Date September 8, 1994.

Grant C. Jaquith, Asst. U.S. Atty., Syracuse, NY (Gary L. Sharpe, U.S. Atty., N.D. New York, John G. Duncan, Asst. U.S. Atty., on the brief), for appellee.

Louis M. Freeman, New York City, for defendant-appellant Jaime A. Davidson.

Frederick H. O'Rourke, Syracuse, NY, for defendant-appellant Juan A. Morales.

James P. McGinty, Syracuse, NY, for defendant-appellant Robert Lawrence.

Bruce Bryan (William D. Walsh, Syracuse, NY, on the brief), for defendant-appellant Lenworth Parker.

J. Scott Porter, Syracuse, NY, for defendant-appellant Gary Anthony Stewart.

Before: ALTIMARI, JACOBS, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

Jaime Davidson ("Davidson"), Juan Morales ("Morales"), Robert Lawrence ("Lawrence"), Lenworth Parke ("Parke"), and Gary Anthony Stewart ("Stewart"), appeal their convictions after a jury trial conducted in the Northern District of New York, before District Judge Neal P. McCurn, on various charges stemming from the drug-related killing of an undercover police officer, deputized as a federal agent, that took place in Syracuse on October 30, 1990. After a two-month jury trial held in January and February 1993, the defendants-appellants were found guilty as charged.[1] We agree with the government that no claimed error in the proceedings below mandates reversal, and therefore affirm the convictions of all of the appellants.

*Background*

On October 30th, 1990, Wallie Howard, a Syracuse police officer working undercover for the Federal Drug Enforcement Administration ("DEA"), was shot and killed during a cocaine "buy-bust" taking place in the parking lot of Mario's Big M Market in Syracuse.

According to the testimony adduced at trial, Davidson was the head and supplier of a cocaine conspiracy that had begun in Syracuse in or around 1988. The conspiracy allegedly sold between ten and fifty thousand dollars of cocaine weekly, with Davidson supplying the cocaine and receiving the bulk of the proceeds. The testimony indicated that Parke was a chief lieutenant of Davidson's, and that Parke and Morales frequently delivered cocaine to customers who had called them on their beepers to place orders. Lawrence was a seller at one of the conspiracy's drug apartments; he also functioned as "muscle" for the conspiracy. Stewart had dealt cocaine for the conspiracy in the past, and owed the group a debt for cocaine he had purchased three weeks earlier which turned out to be "bad." He was invited to participate in the events of the 30th as a means of paying off the debt he owed to the conspiracy for this cocaine.

On October 18, 1990, Agent Howard and confidential informant Luther Gregory purchased 3 ounces of cocaine from Morales for $2700. While the deal took place in Gregory's apartment, Parke walked around the apartment-house, apparently conducting counter-surveillance. On October 22, Howard and Gregory purchased another 4 ounces of cocaine from Morales. Parke waited in the car outside while Morales delivered the cocaine and collected the money. At that purchase, Howard and Gregory inquired

---

1. One defendant, Dean Thomas, was acquitted.

about the possibility of buying an additional 1.5 kilograms of cocaine. Morales indicated that he would be able to supply that amount, and the transaction was scheduled for October 29th. Because Parke and Morales did not arrive with the cocaine on the 29th, the sale was rescheduled for the 30th.

The morning of October 30th, the DEA drug task force met to schedule the buy-bust. Because more than $40,000 in cash was to change hands, the agents were concerned about the possibility of a robbery, and attempted to arrange the purchase in a public location. Their fears were well-founded; Davidson had made plans to rob Gregory because he felt Gregory had robbed him in the past.

The defendants also met the morning of the 30th,[2] and Davidson laid out his plan to rob Gregory of the money. Parke supplied Lawrence with a .357 caliber revolver, and Stewart was armed with a .22 caliber handgun. Morales was to negotiate the deal and act as the driver, and Lawrence and Stewart were to conduct the actual robbery. Davidson and Parke remained behind as the others left to meet Gregory.

Morales met with Agent Howard and Gregory at Gregory's apartment, and they agreed to do the deal in the parking lot of Mario's Big M. When the buyers arrived at the parking lot, Morales told Gregory to come with him to Morales's apartment to check the quality of the cocaine. When they arrived at Morales's apartment, Lawrence and Stewart emerged with guns drawn. They bound and gagged Gregory, breaking his wrist in the process. Morales, Lawrence, and Stewart then returned to Mario's Big M. While Morales waited in his car, Lawrence and Stewart, both armed, approached Gregory's vehicle, where Agent Howard was seated in the passenger seat. Stewart proceeded to the driver's side and got in the driver's seat, while Lawrence went around the back of the vehicle to the passenger side. The following conversation was recorded on the agents' equipment:

> Stewart: What the fuck's up?
> Howard: Huh?

Lawrence: Open up the door.

Stewart: Tell me where the money is.

Howard: What money?

Lawrence: Hey, hey, hey ...

Stewart: Hey, don't shut ...

Lawrence: Open the door, man.

At that point, conversation ceased and background noises are heard on the recording. According to trial testimony, Stewart had the loaded .22 in his hand, and tried to shoot, but was unsuccessful because no round had been placed in the chamber. Agent Howard got three shots off, one of which struck Stewart in the shoulder. From behind Howard, Lawrence, who was standing at the rear passenger side of the vehicle, fired the .357 at Agent Howard, striking him in the rear of the head and killing him. Stewart was arrested seconds later slumped against a wall with the .22 nearby. Morales and Lawrence attempted to flee but were both apprehended within moments; the murder weapon was recovered from the floor of Morales' vehicle. Both Morales and Stewart waived their *Miranda* rights, made admissions, and signed confessional affidavits.

At trial, in addition to the detailed confessions, the government presented significant testimony that established the facts underlying the longstanding cocaine ring. Daryl Gibbs, a cooperating coconspirator, testified at length about the operation of the conspiracy. He also testified that the conspirators had planned to rob someone who had robbed Davidson in the past. Gibbs also testified that he saw Davidson after the shooting, and that Davidson stated that he had told his men that "if the guy [Gregory] was with someone, don't rob him." Other witnesses confirmed various aspects of the conspiracy. Additionally, bystander witnesses described seeing one man [Stewart] holding a gun stagger backwards and fall, lying there until apprehended by the police, and another man [Lawrence] standing by the rear passenger side of the car, holding a smoking gun and uttering expletives.

---

**2.** Gwendolyn Morrow testified that she was Lawrence's girlfriend and that on the morning of October 30th, all of the defendants-appellants met in her apartment.

In his confession, Morales recounted the events of the day largely as outlined above. He stated that seated in his car in the parking lot, he saw Stewart draw a gun and get shot by Howard. He further testified that Lawrence then shot Howard in the head, threw his gun into Morales' car, and started to run.

Stewart's confession was largely consistent with that of Morales. However, he stated that it was Lawrence who brandished a handgun, whereas he had kept his gun in his pocket until the shooting began. Stewart testified that he asked "Where is the money" and that when Howard appeared to be reaching for a gun, Stewart threw his own gun away and started out of the car. He stated that he then felt a sharp pain in his back and fell to the ground. He was apprehended with the .22 a few feet away from him.

At trial, the defendants-appellants were found guilty as charged. All of the defendants were sentenced to life terms on Counts I, VI, and VII, for narcotics conspiracy, felony murder committed in furtherance of a robbery, and intentional killing of a federal agent, respectively, to be served concurrently, plus five years on the firearms charge. Certain of the defendants also received two or four twenty year terms on counts involving distribution of cocaine.[3] Final judgement was entered on July 1, 1993.

### Discussion

The appellants make various claims of error. None justifies reversal of their convictions.

### I. Self-defense

The defendants contend that the district court erred in not specifically charging the jury that it was the government's obligation to prove the absence of self-defense beyond a reasonable doubt. The government generally has the burden of disproving self-defense beyond a reasonable doubt once it is raised by a defendant. *United States v. Alvarez*, 755 F.2d 830, 842–43 (11th Cir.), *cert. denied*, 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985). For reasons not clear, Judge McCurn agreed to give only a portion of the requested self-defense charge (which was taken virtually verbatim from Leonard B. Sand et al., *Modern Federal Jury Instructions*, 1993). He declined to give the last two paragraphs of the requested charge, which expressly placed the burden on the government to prove beyond a reasonable doubt that the defendants did not act in self-defense. The defendants claim that this omission was error.

Some circuit courts have held that the failure to provide a separate instruction explaining that the government bears the burden of proof on self-defense can constitute reversible error. *See, e.g., Government of Virgin Islands v. Smith*, 949 F.2d 677, 686 (3d Cir.1991); *Guthrie v. Warden, Maryland Penitentiary*, 683 F.2d 820, 824–26 (4th Cir. 1982); *United States v. Corrigan*, 548 F.2d 879, 883–84 (10th Cir.1977). These courts have held that the failure specifically to so instruct the jury suggests the incorrect inference that, although the government must prove the elements of the offense beyond a reasonable doubt, the *defendant* must prove self-defense.

The government contends that the charge, taken as a whole, correctly placed the burden on the government. *See Virgin Islands*, 949 F.2d at 682–3 n. 4; *Corrigan*, 548 F.2d at 882. We need not rule on this contention because, even if the charge failed to place the burden on the government, there was no reversible error in this case. That is be-

---

**3.** Count I charged Davidson, Parke, Lawrence, Morales, and Stewart with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846. Counts II and III charged Davidson with distributing cocaine, and Counts IV and V charged Davidson, Parke, and Morales with distributing cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count VI charged Davidson, Parke, Lawrence, Morales, and Stewart with murdering Agent Howard in the attempt to perpetrate a robbery, in violation of 18 U.S.C. §§ 1111, 1114, and 2. Count VII charged Davidson, Parke, Lawrence, Morales, and Stewart with murdering Agent Howard during the commission of and in furtherance of the conspiracy to distribute cocaine, in violation of 21 U.S.C. § 848(e)(1)(B) and 18 U.S.C. § 2. Count VIII charged Davidson, Parke, Lawrence, Morales, and Stewart with using, or aiding, abetting and causing the use of, a firearm in a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1) and (2).

cause, given the jury's finding that the defendants committed the killing of Agent Howard in an attempt to rob him, the defendants were not entitled, as a matter of law, under the circumstances, to rely on the defense of self-defense.

It was undisputed that Stewart and Lawrence approached Howard's car armed respectively with .22 and .357 revolvers, and that seconds later Lawrence shot and killed Howard. The jury necessarily found in its verdict on Count VI that the defendants killed Howard in the course of their attempt to rob him. Even in the unlikely event that, as Stewart and Lawrence testified, Howard was the first to draw his gun, and that Lawrence believed Howard would kill him if he did not draw his gun, the defendants were nonetheless not entitled (given the jury's finding of attempted robbery) to the defense of self-defense because their need to defend themselves arose out of their own armed aggression.

■ One who commits or attempts a robbery armed with deadly force, and kills the intended victim when the victim responds with force to the robbery attempt, may not avail himself of the defense of self-defense.

> It has long been accepted that one cannot support a claim of self-defense by a self-generated necessity to kill. The right of homicidal self-defense is ... denied to slayers who incite the fatal attack.... In sum, one who is the aggressor in a conflict culminating in death cannot invoke the necessities of self-preservation.

*United States v. Peterson,* 483 F.2d 1222, 1231 (D.C.Cir.), *cert. denied,* 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973) (footnotes omitted); *see also Melchior v. Jago,* 723 F.2d 486, 493–94 (6th Cir.1983), *cert. denied,* 466 U.S. 952, 104 S.Ct. 2156, 80 L.Ed.2d 542 (1984); *People v. Guraj,* 105 Misc.2d 176, 431 N.Y.S.2d 925, 927 (N.Y.Sup.Ct.1980); N.Y. Penal Law, § 35.15(1)(b) McKinney (1988).

■ Under this principle, the defendants had no entitlement to any self-defense charge. The charge was therefore unnecessarily favorable to the defendants in that it offered the jury the option to acquit by reason of self-defense. The judge's failure to make clear that the burden on the issue of self-defense rests on the government cannot have prejudiced the defendants when they had no right to have the jury consider the issue at all.

## II. Felony murder and malice aforethought under 18 U.S.C. § 1111.

■ Defendants next contend that the district court erred by failing to instruct that first degree felony murder under 18 U.S.C. § 1111 requires both a finding of malice aforethought *and* either a premeditated killing or a killing committed during the perpetration of an enumerated crime, such as a robbery. The contention is without merit. § 1111(a) provides that

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any ... robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

The judge charged the jury that the government must prove beyond a reasonable doubt several elements, including "Two: The act of killing was done with malice aforethought: Three: Such act of killing was done in the attempted perpetration of a robbery." He then added, "A killing is done with malice aforethought if it is deliberate and intentional ... or if it results from the perpetration of or attempt to perpetrate a robbery." The defendants object to the last quoted sentence. They contend that under the statute, malice aforethought, as well as the perpetration of a robbery, are required.

Under the statute, which largely follows the common law's definition of murder, there are several ways in which the element of malice aforethought can be satisfied. One way the government can demonstrate malice aforethought is by showing that the killing was committed in the commission of a robbery; under the traditional common law felony murder rule, the malice of the robbery satisfies murder's malice requirement.

In construing a murder statute similar to § 1111, the Supreme Court pointed out in *Schad v. Arizona*, 501 U.S. 624, 639–40, 111 S.Ct. 2491, 2501–02, 115 L.Ed.2d 555 (1991), that

> At common law, murder was defined as the unlawful killing of another human being with "malice aforethought." The intent to kill and the intent to commit a felony were alternative aspects of the single concept of "malice aforethought." ... [S]tatutes have in most cases retained premeditated murder and some form of felony murder (invariably including murder committed in perpetrating or attempting to perpetrate a robbery) as alternative means of satisfying the mental state that first degree murder presupposes.

In *United States v. Browner*, 889 F.2d 549 (5th Cir.1989), the Fifth Circuit noted that "The common law also recognized a fourth variety of malice, known as the 'felony murder' rule. Some aspects of this traditional rule survive in the provisions of the federal statute elevating the seriousness of murder committed in the course of certain felonies. *See* 18 U.S.C. § 1111(a)." *Id.* at 552 n. 2 (citation omitted). Judge McCurn's charge that a "killing is done with malice aforethought ... if it results from the perpetration of ... a robbery" was correct.

### III. The supplemental charge of intentionality under 21 U.S.C. § 848

■ The defendants contend that Judge McCurn committed error in answering a jury question as to the meaning of the words "intentionally killed," as used in Count VII. The statute, 21 U.S.C. § 848(e), provides that

> any person, during the commission of, [or] in furtherance of ... a felony violation of this subchapter or subchapter II of this chapter who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of any Federal ... law enforcement officer engaged in ... the performance of such officer's official duties ... shall be sentenced to any term of imprisonment ... which may be up to life imprisonment, or may be ... death.

21 U.S.C.A. § 848(e)(1)(B) (West Supp.1994).

The trial judge initially instructed the jury on this count as to each defendant that the government must prove that he "intentionally killed Agent Wallie Howard, Jr., or aided, abetted, counseled, commanded, induced, procured, or caused the intentional killing of Agent Wallie Howard." During deliberations, the jury asked the court to define the words "intentionally killed." The trial court rejected various suggested formulations to the effect that intentional killing must be done "on purpose," finding that they were based on inapplicable New York State penal law. He then, following Devitt and Blackmar on "proof of intent," instructed as follows:

> The intent ·of a person at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person intended at a particular time, you may consider in the statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid you in your determination of that person's intent. You may · infer, but you are certainly are not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly committed. In other words, if the act itself was knowingly done, you may infer, but you're not required to infer, that the defendant intended the natural and probable consequences of that act.

The defendants contend that this supplemental charge constitutes reversible error because it did not convey that under § 848, an intentional killing requires purpose or a conscious desire of the consequences. *See Tison v. Arizona*, 481 U.S. 137, 150, 107 S.Ct. 1676, 1684, 95 L.Ed.2d 127 (1987) (" 'one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts.' ") (citing W. Lafave and A. Scott, *Criminal Law* § 28, p. 196 (1972)).

There was no error in what the court told the jury. The worst that can be said of this supplemental charge is that it may have focussed on an issue that did not directly respond to the jurors' concern. Had the jurors

been unsatisfied and wished a further, or repeated, explanation of the concept of intentionality, they were of course free to pursue the inquiry. The supplemental charge was certainly not reversible error.

### IV. Davidson's alibi defense

■ At trial, Davidson presented four witnesses who testified that he was in New York City at or about the time that Officer Howard was shot in Syracuse. Davidson contends that Judge McCurn erred in not giving the jury an alibi defense charge. He cites to the proposition of law that a "defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). Additionally, citing *United States v. Bryser*, 954 F.2d 79, 87 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992), he argues that an alibi charge should be given whenever a defendant asserts an alibi defense. However, *Bryser* itself explains precisely why Judge McCurn's decision not to give the alibi charge was correct. We noted in that case that

> we agree with the government's contention that there was no basis for an alibi instruction because an alibi covering the time of the theft is no defense to crucial charges in the indictment. Specifically, the government did not have to prove that ... [the defendants] were present in the vault on the Sunday evening of the robbery in order for the jury to convict the defendants of *conspiring* to commit mail fraud, wire fraud, and theft from an interstate shipment. Once a conspiracy is established, the liability of defendants extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy, such as the theft, mail fraud, and wire fraud. Given the interrelationship of these charges, then, the district court could have misled the jury by submitting the requested instruction. The jury might have erroneously concluded that a failure to prove

presence in the vault on the night of the theft beyond a reasonable doubt required an acquittal on all charges. Therefore, we believe the district court did not err in refusing to grant the supplemental instruction.

*Id.* at 87–88 (citations omitted). *See also United States v. Burse*, 531 F.2d 1151, 1153 (2d Cir.1976) (no alibi charge necessary when presence at scene not an element of crime charged).

In this case, Davidson's evidence that he was in New York City at the time of the killing is not inconsistent with the jury's finding him guilty on all charges. Count I was a conspiracy count, and Counts II through VIII included both an aiding and abetting theory and a *Pinkerton* theory. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). There was extensive evidence that Davidson masterminded the narcotics conspiracy and the plan to rob Gregory and Howard. Part of the evidence of Davidson's complicity in the plan to rob Gregory related to times prior to October 30th. This evidence fully justified his conviction on the accomplice or conspiracy theory, regardless whether he was in Syracuse on the 30th. (None of the government's witnesses contended he was present at the scene of the robbery and killing.) His evidence that he was in New York City was therefore not an alibi.[4] *See United States v. Guillette*, 547 F.2d 743, 751–52 (2d Cir.1976), *cert. denied*, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977) (lack of alibi instruction not error because "alibi" did not exonerate; it merely attempted to establish that appellants may not have participated in one of many overt acts of the conspiracy). Because Davidson's "evidence" was not inconsistent with his guilt, there was no error in Judge McCurn's refusal to give an alibi charge.

We have examined the defendants' remaining contentions and they are without merit. Some are discussed in a separate summary order.

---

**4.** Using reasoning identical to that of the Second Circuit in *Bryser*, the district court also found that charging on the alibi, which would not exon-

erate Davidson, might well confuse the jury. We agree.

*Conclusion*

The judgments of conviction are affirmed.