UNITED STATES of America,

v.

**William PETERSON, also known as "Crazy Billy," Defendant.**

**No. CR 00–1260(ADS).**

United States District Court, E.D. New York.

Jan. 25, 2002.

344

Alan Vinegrad by Leonard Lato, Assistant United States Attorney, Brooklyn, NY, for Plaintiff.

Dershowitz, Eiger & Adelson, P.C. by Nathan Z. Dershowitz, New York City, Herzfeld & Rubin, P.C. by Ronald G. Russo, New York City, David W. Clayton, Hauppauge, NY, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

In a verdict rendered on November 27, 2001, the defendant William Peterson ("defendant" or "Peterson") was convicted by the jury on all seven counts in the superceding indictment. The defendant now moves for post-verdict relief pursuant to Fed. Crim. Rules. 29 and 33.

Let the record indicate that during this trial, and until recently, the defendant was represented by David W. Clayton, Esq. After the verdict was rendered, and following the Clayton letter moving for the relief addressed above, the defendant retained new counsel, Ronald G. Russo, Esq., who wrote a letter on behalf of the defendant on December 20, 2001, and who appeared to argue on behalf of the defendant on December 21, 2001. Thereafter, the defendant retained the firm of Dershowitz, Eiger & Adelson.

### I. AS TO THE RULE 29 MOTION

#### A. Defendant's Contentions

In the Clayton letter dated December 11, 2001, his counsel states that: "I submit that as to counts 1–5 I have no legal basis upon which the court could therefore presently grant my motion post verdict." However, as to Counts Six and Seven the defendant contends that the Government's proof was not legally sufficient. In Counts Six and Seven it is charged that the defendant William Peterson "knowingly and intentionally used and carried destructive devices, to wit: Molotov cocktails" during and in relation to crimes of violence, namely, arson, in violation of 18 U.S.C. § 924(c). With regard to Counts Six and Seven, the defendant asserts that:

> As to counts 6 and 7 however I submit that even under a *Valenti* standard (*United States v. Valenti*, 60 F.3d 941 (2d Cir.1995)) the governments (sic) proof was not legally sufficient in that the government has conceded that in its proof Mr. Peterson never told his co-conspirators how to burn any buildings. While the statute incorporates a Molotov cocktail as a destructive device, there is no proof in this record that Peterson aided, abetted, counseled, commanded or induced Muscat to use a Molotov cocktail or procured any Molotov cocktail components is (for?) Muscat's use. Nor is there any proof of any conversation regarding same between Peterson and Hart.

In addition, Peterson contends that the *Pinkerton* theory was not made out because:

> In the absence of proof as to any conversation or act by William Peterson regarding this particular destructive device being employed the term "reasonably foreseeable" reduces itself to speculation, conjecture, guesswork and surmise as a standard of legal proof. I submit that such is not the case and the motion with respect to counts 6 and 7 should be granted.

In addition, in the Russo letter dated December 20, 2001, the defendant further contends "that the evidence was insufficient to establish that the use of so-called 'Molotov cocktails'—'destructive devices' under 18 U.S.C. § 924(c)(1) was reasonably foreseeable to Mr. Peterson." Citing to *United States v. Masotto*, 73 F.3d 1233, 1239–40 (2d Cir.1996), and *United States v. Medina*, 32 F.3d 40, 45 (2d Cir.1994), the defendant asserts "that in order to sustain a conviction under § 924(c), the evidence must establish more than mere knowledge that his coconspirators might use destructive devices; rather, the evidence must establish that the defendant 'performed some act that directly facilitated or encouraged the use or carrying' of a Molotov cocktail."

Russo further contends that "[T]he Government has conceded, as it must, that Mr. Peterson neither knew that Mr. Hart's accomplices planned to use 'Molotov cocktails' or that he suggested that they do so. (*See* the Government's Summation at Tr. 903). Accordingly, there simply is *no* evidence, let alone sufficient evidence, that Mr. Peterson 'performed some act that directly facilitated or encouraged the use of 'Molotov cocktails' to sustain the convictions on these two counts as is required by the law of this Circuit.'"

Russo also contends that *Pinkerton* is inapplicable because "there was no charged conspiracy to commit arson." Rather, "the single conspiracy charged was the Hobbs Act conspiracy, charged in Count One of the superceding indictment, in which Mr. Peterson was alleged to have conspired to 'obtain, from the owners of Bottles & Cases, Bottle Bargains and Frank's property, to wit: the owners' right to compete for business in the retail liquor industry, with the owners' consent, which consent was to be induced by wrongful use of actual and threatened force ... [.]'"

In sum, as to *Pinkerton*, the defendant contends that the established extortion conspiracy is insufficient to support this conviction. "Given the complete lack of evidence in this case that those who employed the destructive devices (*i.e.* 'Molotov cocktails') were even aware of the charged conspiracy, let alone joined it, *Pinkerton's* theory of liability for the reasonable foreseeability of co-conspirators' acts is inapplicable. Stating it differently, Mr. Peterson may not be held liable for the acts of his co-conspirators absent evidence that they were his co-conspirators. On these facts, the substantive crimes of others in employing the destructive devices are not attributable to Mr. Peterson under *Pinkerton* as the Government claims."

## B. *The Rule 29 Standard*

The standards governing Rule 29(c) with regard to a motion for Judgment of Acquittal after discharge of the jury are clear and well settled. As stated in *United States v. McDonough*, 56 F.3d 381 (2d Cir.1995), and in many other recent Second Circuit cases, Rule 29 is to be applied as follows:

"An appellant challenging the sufficiency of the evidence bears a very heavy burden." *United States v. Rivera*, 971 F.2d 876, 890 (2d Cir.1992) (citation and internal quotations omitted). We review the sufficiency of the evidence in the light most favorable to the government, *United States v. Amato*, 15 F.3d 230, 235 (2d Cir.1994), and draw all reasonable inferences in the government's favor. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Torres*, 901 F.2d 205, 216 (2d Cir.), *cert. denied sub nom. Cruz v. United States*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). "The conviction must stand if any rational trier of

fact could have found the essential elements of the crime established beyond a reasonable doubt." *United States v. Moore*, 54 F.3d 92, 100 (2d Cir.1995). *See also United States v. Finley*, 245 F.3d 199, 202–03 (2d Cir.2001); *United States v. Gore*, 154 F.3d 34, 40 (2d Cir.1998).

### C. *The Proof*

Considered in the light most favorable to the Government, the evidence was sufficient to convict the defendant on the charges based on a *Pinkerton*, reasonably foreseeable theory. Also, the evidence was sufficient to convict the defendant of aiding and abetting in the using or carrying of a Molotov cocktail to commit a crime of violence; namely, as to Count Six, with regard to the arson charged in Count Four as to Bottles & Cases retail liquor store, and, as to Count Seven with regard to the arson charged in Count five as to the Bottle Bargains retail liquor store.

■ The jury convicted the defendant of Count Four (arson as to Bottles & Cases) and Count Five (arson as to Bottle Bargains). Therefore the first element, namely, that the defendant committed a crime of violence was proven, beyond a reasonable doubt. The second element to be established by the Government was that the defendant knowingly used or carried a destructive device in relation to the arson crimes, or, as the Government contended, that the defendant aided and abetted in the commission of those crimes. In this regard, the Court first notes that, pursuant to the statute, 18 U.S.C. § 924(c), the term "destructive device" includes a Molotov cocktail type of device.

The Court finds that the Government proved that Peterson aided and abetted in the use or carrying of Molotov cocktails. Also, the Government proved that Peterson could have reasonably foreseen that Molotov cocktails would be used to set fire to retail liquor stores Bottles & Cases and Bottle Bargains. Let's look at the record.

Susan Bronstein, General Manager of the organization called "Price Fighters" testified that William Peterson "runs" this 35 member group of liquor stores and further stated, as follows:

Q What do you do for a living?

A General manager for Price Fighters.

* * * * * *

Q What is Price Fighters?

A A cooperative advertising group.

* * * * * *

Q How many stores are currently members of Price Fighters?

A 35.

* * * * * *

Q Have you ever heard of a Stephen Herman?

A Yes.

Q Has he ever been a member of Price Fighters?

A No.

Q Do you know Iris Herman?

A Yes.

Q As far as you know, has she ever been a member of Price Fighters?

A No.

Q Do you know Mitchell Herman?

A Yes.

Q Has he ever been a member of Price Fighters?

A No.

* * * * * *

Q Now, do you know a person by the name of William Peterson?

A Yes.

* * * * * *

Q What does he do?

A He's the retail consultant for the company.

Q What company is that?

A Price Fighters.

Q And do you know what position he holds at Price Fighters?

A Well, he's the retail consultant for the company.

Q He's the person you report to?

A Yes, I do.

Q Is there anybody above Mr. Peterson? In other words, you report to him. Do you know whether or not he reports to anyone else?

A No.

\* \* \* \* \* \*

Q Now, at any time from the time that you've been there in the nine years, did anyone run Price Fighters other than William Peterson:

A Since I'm there?

Q Yes. In the nine years you've been there.

A No.

\* \* \* \* \* \*

Q Isn't it a fair statement that you stated the other day that one of the things Price Fighters tries not to do is to charge too low a price because it's unfair to the small liquor owners?

A Yes.

\* \* \* \* \* \*

Q So you want to comply with the suppliers.

A Yes.

Q And not establish your own prices. Correct?

A Exactly.

Q And it's a fair statement that all the members of Price Fighters charge the same prices, correct?

A Yes.

Tr. at 145–153.\*

Steven Herman testified that the defendant told him that he would like to see him and his wife raise the prices for the liquor they sold at their store.

Q Now, did you have a conversation with Mr. Peterson at this meeting?

A Yes.

Q Please tell the ladies and gentlemen of the jury what the two of you said to each other.

A Mr. Peterson approached me and said "I'd like to see your wife's store raise the prices that you're selling at. They are very low prices. If we could raise the prices, we could all make more money."

\* \* \* \* \* \*

Q Did you and Mr. Peterson say anything else to each other that night after you told him you weren't going to do what he asked you to do?

A I believe he said to me, "Why don't you think about it?"

Tr. at 66–68.

Mitchell Herman ran a full page ad in Newsday with very aggressive prices and within a few days his store was set on fire.

Q Now shortly before December 14, 1995, did you run a big ad in *Newsday?*

A Yes.

Q Tell us about the ad that you ran.

A It was a full-page ad in *Newsday.*

Q All right. What did it say?

A It had big boxes with prices, very aggressive prices, and like a laundry list of a lot of items we had in the store.

Q And when you say they were very aggressive prices, what does that mean?

---

\* Tr. refers to the trial transcript.

A Sometimes we would sell products even below our own cost.

Q Were the—basically some of the prices that low in the ad that date?

A Yes.

Q What date did the ad come out?

A I don't recall the exact date.

Q To the best of your recollection, narrow it down.

A Probably a Wednesday, maybe a Saturday and Sunday the week prior.

Q So within seven days of December 14th?

A Yes.

Q Now tell us what happened on December 14, 1995.

A December 14, 1995, I was awakened in my home by a phone call that the store—that there was fire trucks at the store and the alarm had been going on.

Tr. at 122–23.

William Ricchiuti, a/k/a Ricco, who operated a tanning salon next to Bottles & Cases, testified that he saw the shooting incident of May 7, 1991, when, allegedly, Peterson fired shots through the window of Bottles & Cases. He described the van as one of an unusual color, silver with red stripes. Ricchiuti did not get a good look at the shooter and described him as husky, white male, stocky, approximately 30 to 35 years of age and dark bushy hair with a beard. Ricchiuti further testified:

Q The next day, did some other member of the police department come to see you?

A Yes.

 \* \* \* \* \* \*

Q And do you recall what it was that you told him?

A Yes.

Q What was that, sir?

A I gave him a description of exactly what happened. And we were actually walking back and forth in front of the liquor store and my store going over, you know, some of the details that he wanted to know about what took place that night.

 \* \* \* \* \* \*

Q While you were talking to the detective in front of the liquor store, did something happen unusual again?

A Yes.

Q Tell the ladies and gentlemen of the jury what happened then.

A We were in the front of the liquor store, walking towards my salon, and I gave a pretty good description of the vehicle. And the detective had looked up, noticing a vehicle coming out of the side street, and he said, "Would you notice if that vehicle looks like the vehicle coming out there?"

And I said, "Yes, that looks like the vehicle."

So we both watched the truck approach the stop sign, make a left-hand turn to come across the stores where we were, and I was able to see the truck in full view.

And I said to the officer, "That's the truck right there."

Q And what happened after that?

A The officer put his light on—the officer raced to his car, put his light on, raced after the individual.

Q After the car passed in front of you, did it look like the same car, or to the best of your recollection it looked or it was the same car?

A It was the same car.

Q What was it that makes you so sure that it was the same car?

A It was a long truck with silver and red paint with a tire connected onto the back. And it wasn't—it's not a common

truck that you see very day, considering the colors.

Q Did you get a chance to see whoever was driving the car as it passed you, because it's at night now?

A It happened pretty quick. Just the gentleman that was in that truck as it was passing by was looking up at us—

\* \* \* \* \* \*

THE WITNESS: When the truck came by in front of the stores, the gentleman in the truck was looking directly at us and we were looking directly at him.

And I said to the officer, "That's the truck right there."

Before I turned around, he was in his car racing after this individual.

Tr. at 168–71.

Detective Robert Bautz of the Suffolk County Police Department testified that the day after the shooting he stopped the same silver and red striped van, which was riding past Bottles & Cases and identified the defendant as the driver and owner of the van.

The defendant was a licensed owner of a .38 caliber Colt revolver. The bullet fragments in the liquor store and the defendant's revolver were tested by George Reich, a forensic analyst.

Q Now, when you say that the two rounds, the two evidence rounds that you received in the bullet boxes, came from that particular gun, are you saying that it came from a gun like that or it came from that gun to the exclusion of any other firearm?

A I'm saying that after examining the two expended bullet jackets and the expended bullet jackets and the expended bullet, and comparing it to the test specimens fired from the Colt revolver, I'm saying that they were identified as posi-

tively being fired from that particular Colt revolver.

Q Could they have been fired from any other Colt revolver?

A Not in my opinion, no.

Q Or any other type of firearm?

A No.

Tr. at 451–52.

There is direct evidence of the defendant's participation in the arson by use of Molotov cocktails, although those words were never mentioned. Jesse Hart, a night club operator, testified that William Peterson initially asked him to burn down Frank's Wine & Liquor store, but, after that "was too hard to do," it was agreed to instead, burn down Bottles & Cases and Bottle Bargains.

Q Tell the ladies and gentlemen of the jury what happened on the particular day when Frank's came up.

A I walked into the store to buy liquor, picking up a few bottles, and I saw Billy. And Bill said, "Before you leave I'd like to talk to you in the office."

\* \* \* \* \* \*

Q When you met him in his office, what did you and he talk about?

Well—he asked me if I knew anyone who was looking to make any money, and I said yeah. *And he said to me that he had a place that he wanted fire bombed.* So I told him, "Yeah, I probably can get somebody."

Q Okay. Did he tell you anything more at that time?

A He gave me the address.

Q What was the address?

A Wheeler Road in East Islip.

\* \* \* \* \* \*

Q ... What happens next?

A We take a ride out by Frank's, park in the back, the parking lot. Him and I go in, look around.

That's not the defendant, that's his son, Hart's son.

And I go in, look around. I buy a bottle, look around, check the place out.

When I come out, I noticed the place has steel doors that come down and it is closed up very tight. So I told Stephen, we looked around, we drove around the place and I told Stephen, he told me the only way he could get into this place would be to go through the roof.

Q And what was your response to his suggestion that the only way to get in might be through the roof?

A I told him it was too much exposure, too much of a major—it was a main road, and the shopping center that was right across was very big, a lot of traffic.

Q After you leave there, at some point did you tell Mr. Peterson what happened?

A Yes.

Q Was it that day or some later date?

A It was that date. It was a later date. Not that day. It was a few days later, a day or two later.

Q Does the subject ever come up again between you and Mr. Peterson?

A About Frank's?

Q Yes.

A No, other than the conversation we had in his office about it.

Q I don't understand. Which conversation? The one you testified about earlier?

A No. I went back and told him, went back and saw him and I told him the store was too hard to do. We couldn't do it.

\* \* \* \* \* \*

Q All right. Sometime later did you talk to Mr. Peterson again about a fire at other liquor stores?

A Yes.

Q About how much later did this happen?

A A few months. It happened around November when I talked to him about it.

Q November of what year?

A '95.

Q All right. Where were you at the time that you had this conversation with Mr. Peterson?

A In his office. In Crazy Billy's.

Q What were you doing there that day?

A Buying liquor.

Q How as it that the subject came up?

A Billy asked me to step into the office. I went into the office and he said to me, "I got these other two places since the other place"—

Q I didn't hear a word you said.

"I have two other places that I need fire bombed, taken care of." I said, "All right." He said, "These should be—I want you to go take a look at them. These should be easier than Frank's since you couldn't do Franks."

Q Did he actually say fire bombed?

A Yes. Burn down.

Q So he didn't use "fire bomb."

A No.

Q "Burn down"?

A Yes.

Q Okay. What else did he tell you?

A He gave me the address at that time of these two places.

Q How did he give it to you? Verbally or in writing?

A On a piece of paper.

\* \* \* \* \* \*

Q And you remember the name of the store?

A Yeah.

Q What are the names?

A Bottles and Cases and Bottle Bargains.

\* \* \* \* \* \*

Q Well, what did this store not have that Frank's did have?

A Could you repeat it?

Q Yes.

Was there something about the exterior of Frank's that made it difficult for you to bomb it or burn it?

A Frank's had steel doors, pull-down doors.

Q Did this store have steel doors?

A No.

\* \* \* \* \* \*

Q After you looked over these two stores with Stephen, what did you do?

A I went back to Billy's that day or the next day. Crazy Billy's.

Q Did you go for the express purpose of going to see Bill—

A Yes.

Q Do you want to let me finish.

—or did you go there to buy liquor?

A I guess both. When I'm there I always picks up liquor, but I went there really to talk to him. That was the main purpose.

Q When you went to talk to Mr. Peterson at his store, did you in fact meet with him and talk to him?

A Yes.

Q Where did the conversation occur?

A In his office.

Q Just the two of you?

A Just the two of us.

Q What did you say to each other?

A I told him that Stephen, my son Stephen Muscat said that the stores were easier to do; that it could be done.

Q Well, you agreed with Stephen, right?

A Right. Yes, sir.

\* \* \* \* \* \*

Q Now, what happens next?

A He gave me the photo. I asked him. Because Stephen had asked me to find out how much money he would pay, and he told me he would give me $8,000: $4,000 for each store.

Q Right. And did Mr. Peterson say anything else about either of these two stores?

A He did. But I don't remember if it was at this sitting or another sitting, but he did mention that the place on the top of the hill, Bottles and Cases, has bullet-proof glass.

Q And did he say anything about how he knew that?

Yeah. He told me that he had taken a couple of shots at it with his gun and he had lost his carry—his permit because of that and it might be difficult, very difficult to get through. *And I said I don't think so. I think Stephen can get through it.*

Tr. at 615–27 (emphasis supplied).

Also, Nicole Cornicelli, a former employee of Peerless Wine & Liquor Distributor, testified to what a jury could consider to be damaging admissions by the defendant.

Q Do you see a current or former customer of Peerless in the courtroom?

A Yes, I do.

Q And who was that?

A William Peterson.

Q How long have you known Mr. Peterson?

A At least 12 years.

Q Did you ever have a conversation with Mr. Peterson regarding prices at Frank's?

A Yes.

Q And did Mr. Peterson ever tell you anything about the prices at Frank's?

A Yes.

Q All right. Please tell the ladies and gentlemen of the jury in your own words the first conversation that you recall: when it was and what was said regarding Frank's.

A There was an ad put in the paper by Frank's Liquors and there was a free bottle given out with a certain purchase. And Mr. Peterson told me to tell my husband and his boss to stop advertising free goods or heads would be rolling, there would be trouble . . . .

&ast; &ast; &ast; &ast; &ast; &ast;

Q Did you ever have any other similar conversations with Mr. Peterson in any following years?

A There were other conversations, warnings to tell my husband not to advertise or don't let Henry or Frank advertise.

Q How often or how many times did this occur?

A More than a few. I couldn't give you a specific number. I will say more than eight.

&ast; &ast; &ast; &ast; &ast; &ast;

Q Now back in 1995, during that year did you have occasion to go into William Peterson's store?

A Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q And the holiday season of 1995, in other words after Thanksgiving of 1995, how often would you have occasion to go into Mr. Peterson's store?

A Every Monday.

Now, back in December of 1994, particular around December—December '95, I'm sorry, did you hear about the fire at Bottles and Cases?

A Yes, I did.

Q Did you hear about the fire at Bottle Bargains?

A Yes, I did.

Q On the Monday following the fire, did you have occasion to go to Mr. Peterson's store?

A Yes.

Q What were you doing there?

A My normal sales call: putting up displays, fixing displays, making presentations.

Q At some point while you were in Mr. Peterson's store, did you have occasion to overhear Mr. Peterson say a few things?

A Yes, I did.

&ast; &ast; &ast; &ast; &ast; &ast;

Q And where were you in relation to Mr. Peterson and his office?

A In the doorway of his manager's office, which was the front end of his office.

Q About how far away would you say you were from Mr. Peterson at the time?

A Maybe 5 or 6 feet.

Q Could you please tell the ladies and gentlemen of the jury what you heard?

A The comment that came out of it the office by Mr. Peterson was "you pay good money for bad aim."

THE COURT: Aim? A-i-m?

THE WITNESS: That's correct.

&ast; &ast; &ast; &ast; &ast; &ast;

THE COURT: Was anyone with him in the office?

THE WITNESS: No, it's an open office. Pete White was speaking and

they made a comment, "what happened?" And that's when Billy Peterson made the comment, "We paid good money for bad aim."

\* \* \* \* \* \*

Q And do you know who said that?

A Pete White said it.

Did you hear what happened over at Steve Herman's? And there was chuckling and laughing, and then the comment came through from Billy.

Q Billy Peterson?

A Billy Peterson.

Q Which was what?

A You pay good money and you get paid (sic) aim. Must be "bad aim," but it says "paid aim."

Then the witness was asked on cross-examination by defendant's counsel about her grand jury testimony.

A After I got my order, we were talking. Another salesperson, another person, was there. Pete was there. Billy was in his office.

The other person that was there made a statement to Pete: "Did you hear what happened about the Steve Herman bombing?" "Oh, my God." And then Pete, quite nastily, in a stupid manner, turned around and said: "What a shame. It's so sad, isn't it?" They all laughed a little bit.

I got disgusted, made a fact and walked away. I don't know if they thought I was still around there or left, but I was just on the side of a display, and Billy Peterson yelled out from the office something to the effect of: "It's amazing how bad their aim could be. You pay good money and this is what happens."

Tr. at 332–41, 348.

The Government established that the defendant William Peterson could have reasonably foreseen that Molotov cocktails would be used in carrying out the arsons at issue. Initially Peterson asked Jesse Hart to burn down Frank's Wine and Liquor Merchants. Hart testified that the only way he could have set Frank's on fire would have been to go through the roof. As a result, Hart told Peterson that Frank's "was too hard to do." Hart also testified that, in contrast, he told Peterson that Bottles and Cases and Bottle Bargains "were easier to do." (Tr. 624). With respect to whether it was reasonably foreseeable that Molotov cocktails would be used to ignite the fires, Hart testified that Peterson had cautioned him "that the place on the top of the hill, Bottles & Cases, has bulletproof glass" and "might be difficult, very difficult, to get through." A reasonable jury could find that Peterson was aware that Hart's accomplices would not enter Bottles and Cases and Bottle Bargains through the roof and that the stores' exterior glass would have to be broken. Thus, in order to burn down the store Peterson could have reasonably foreseen that Hart's accomplices, after breaking the glass, would hurl incendiary devices such as Molotov cocktails inside the store.

### D. *Aiding and Abetting and Pinkerton*

As to Counts Six and Seven, the Court charged the jury on two alternative theories of liability, aiding and abetting and *Pinkerton.*

The Court will discuss the defendant's aiding and abetting and *Pinkerton* arguments together, because the discussion with regard to these two theories is somewhat intertwined. The aiding and abetting statute, 18 U.S.C. § 2(a) provides that: "Whoever commits an offense against the United States or aids or abets or counsels,

commands or induces, or procures its commission, is punishable as a principal."

■ It is axiomatic that under the federal aiding and abetting statute, it is not necessary for the Government to show that the defendant himself physically committed the crime with which he is charged in order to find the defendant guilty of the crimes charged in Counts Six and Seven. A person who aids and abets another to commit an offense is just as guilty of that offense as if he committed it himself.

The Court charged the jury that:

In order to aid or abet another to commit a crime, it is necessary that the defendant wilfully and knowingly associate himself in some way with the crime, and that he wilfully and knowingly seeks by some act to help make the crime succeed.

\* \* \* \* \* \*

Further, in order to find the defendant William Peterson guilty of the aiding and abetting charge as to Counts Six and Seven, the Government must prove beyond a reasonable doubt, that the defendant facilitated or encouraged the use or the carrying of the destructive device.

■ To convict a defendant of aiding and abetting a substantive crime, the Government must prove that "the underlying crime was committed by someone other than the defendant and that the defendant either acted or failed to act with the specific intent of advancing the commission of the underlying crime." *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir.) *cert. denied* 519 U.S. 869, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996). Also, as stated in *United States v. Smith*, 198 F.3d 377 (2d Cir.1999), "Much like a conspiracy charge, in order to prove that a defendant aided and abetted a substantive crime, the government must prove that the defendant joined and shared in the underlying crimi-

nal endeavor and that his efforts contributed to its success." *See also United States v. Gordon*, 987 F.2d 902, 907 (2d Cir.1993); *United States v. DeFiore*, 720 F.2d 757, 764 (2d Cir.1983).

■ The often used Second Circuit language in the aiding and abetting phase of the law is that "The requirements this court has established for the offense of aiding and abetting are that he in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed" *DeFiore*, 720 F.2d at 764 (internal quotations omitted). The evidence discussed above satisfies these requirements.

■ The defendant relies on two cases to support his Rule 29 motion with regard to Counts Six and Seven. In *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994), the Court held, with regard to a Section 924(c)(1) offense, an aider and abettor must have consciously assisted in the commission of the specific crime in some active way. "The language of the statute requires proof that he performed some act that directly facilitated or encouraged the use or carrying of a firearm." In this case, the defendant contends that there must be evidence that Peterson prompted or induced the actual perpetrators to use Molotov cocktails.

In *Medina*, the defendant supplied a revolver to one conspirator, but that conspirator did not carry a weapon in the attempted robbery. The defendant did not supply a weapon to another conspirator who did carry a firearm, who was not told of Medina's offer. The Court held that this evidence was insufficient to support an aiding and abetting conviction.

However, in *Medina*, the Court cited to *United States v. Gunning*, 984 F.2d 1476, 1483 (7th Cir.1993), a case in which the

defendant "actually directed his confederate to carry the gun used in the underlying offense—an act that easily supports aider and abettor liability with respect to Section 924(c)". Further, the Court in *Medina* stated:

> We agree with these cases to the extent that they hold that a defendant cannot aid and abet a § 924(c) violation *without knowing (or having reason to know) that a gun will be used or carried in relation to the underlying crime.* However, to the extent that these cases imply that a defendant can aid and abet the use or carrying of a firearm without performing some affirmative act relating to that firearm, we disagree.

*Id.* at 46 (emphasis supplied).

In sum, in *Medina*, the Court concluded that in order to aid and abet in a Section 924(c) offense, an affirmative act relating to the firearm or an affirmative act in furtherance of the confederate's carrying of the weapon, was required. The concluding sentence in *Medina* is also instructive. It stated that: "a defendant who is not present (such as Medina) cannot be said to aid and abet the use or carrying of a firearm simply by aiding and abetting the overall enterprise in which the firearm is employed." *Id.* at 47.

Here, the Government has sufficiently established that Peterson performed affirmative acts relating to the use of a destructive device. Peterson devised the scheme to burn down the two retail liquor stores; he paid the co-conspirators to perform the deeds; and he knew that they would have to break the store windows and use an incendiary device to burn the stores. A reasonable jury could have determined that the Government proved, beyond a reasonable doubt, that Peterson affirmatively participated in the planning to use a destructive device to burn the two retail liquor stores. Moreover, the Court

notes that *Medina* did not involve a *Pinkerton* charge.

The second case relied on by the defendant is even more instructive and does not support the defendant's position. In *United States v. Masotto*, 73 F.3d 1233 (2d Cir.1996), the defendant was convicted of, among other crimes, using and carrying a firearm during the robbery of a truck in violation of Section 924(c). As in this case, the District Judge instructed the jury that it could find Masotto guilty of violating Section 924(c) either under an aiding and abetting theory or under a *Pinkerton* theory. Masotto did not personally participate in the truck robbery during which the co-conspirators used guns. The Government contended that Masotto "was aware that the crew members were carrying guns during the robberies." On appeal, Masotto asserted that the *Pinkerton* instruction was inappropriate in light of the Court's decision in *Medina*. The Second Circuit disagreed and affirmed the Section 924(c) conviction, both on the aiding and abetting and *Pinkerton* theories

As to *Pinkerton*, the Court stated:

> It is well-settled in this Circuit that a jury may be instructed on the *Pinkerton* theory of liability in connection with a charged violation of § 924(c) (citations omitted).

\* \* \* \* \* \*

Our holding in *Medina* does not affect this court's precedent *that a Pinkerton instruction may be given as an alternative theory of liability under § 924(c).* In *Medina*, we addressed the question of whether there was sufficient evidence to support a § 924(c) conviction under an aiding and abetting theory. We held that, in order for a defendant to be convicted under § 924(c) pursuant to an aiding and abetting theory, the defendant must have "facilitated or encour-

aged" the use or carrying of a firearm. *Medina*, 32 F.3d at 45. However, we were not there concerned with a *Pinkerton* instruction and our holding therefore was limited to an aiding and abetting theory of liability. Thus, *Medina* does not affect the applicability of a *Pinkerton* instruction to a § 924(c) conviction. Accordingly, we hold that the district court did not err by instructing the jury on a *Pinkerton* theory of liability in connection with the 924(c) violation. *Id.* at 1240 (emphasis supplied)

Prior to *Masotto*, in an opinion filed after *Medina*, the Second Circuit upheld a conviction where the District Court instructed the jury on both an aiding and abetting and a *Pinkerton* theory of liability. *United States v. Thomas*, 34 F.3d 44, 50 (2d Cir.1994) *cert. denied*, 513 U.S. 1007, 115 S.Ct. 527, 130 L.Ed.2d 431 (1995).

Further, as to the aiding and abetting conviction, the Court in *Masotto* recognized that *Medina* required some act that directly facilitated or encouraged the use or carrying of the firearm. However, the Court stated that the district court's instruction on the aiding and abetting "required the jury to find more than that Masotto had 'mere knowledge' that members of the crew might use firearms." The Court instructed the jury that the Government must prove that "the defendant participated in its commission." These instructions clearly directed the jury that it could not convict Masotto unless it found that he participated in the use and carrying of a firearm. Accordingly, in *Masotto* the trial court did not err in instructing the jury on the elements of aiding and abetting the § 924(c) offense.

This Court similarly instructed the jury that, in order to convict, the Government must prove that "an aider and abettor must have some interest in and participate

in the criminal venture." This jury could have convicted the defendant of committing the crimes set forth in Counts Six and Seven under either the aiding and abetting or the *Pinkerton* theory. Both theories were supported by the evidence adduced at this trial. As stated in *United States v. Malpeso*, 115 F.3d 155, 166–67 (2d Cir. 1997):

> Gallagher also argues that the court erred in instructing the jury on two alternate theories of criminal liability for § 924(c) violations: aiding and abetting and *Pinkerton* liability. This argument is wholly frivolous. We have reaffirmed the appropriateness of aiding and abetting and *Pinkerton* theories of liability for § 924(c)(1) violations in several post-*Bailey* [*v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)] cases, *see id.* [*United States v. Pimentel*, 83 F.3d 55] at 58 [(2nd Cir.1996)] (*Pinkerton* ); *United States v. Pipola*, 83 F.3d 556, 563 (2d Cir.) (aiding and abetting), *cert. denied*, 519 U.S. 869, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *Masotto*, 73 F.3d at 1240 (both), and Gallagher presents no persuasive grounds upon which to distinguish his case from these earlier decisions.

The defendant further contends that there was no charged conspiracy to commit arson. "Rather, the single conspiracy charged was the Hobbs Act conspiracy charged in Count One." He asserts that the co-conspirators "were not aware of the sole conspiracy charged in the indictment, namely, to obtain from the owner's of the victim stores their 'right to compete for business in the retail liquor industry' . . . Stating it differently, Mr. Peterson may not be held liable for the acts of his co-conspirators absent evidence that they were his co-conspirators." This argument is without merit.

It is well-settled that a co-conspirator need not be aware of all of the conspiracy's objectives. In *United States v. Salameh*, 152 F.3d 88, 147 (2d Cir.1998), it was held that "[t]he government is not required to demonstrate that the defendant agreed to all of the conspiracy's objectives, as long as the defendant shared 'some knowledge of the conspiracy's unlawful aims and objectives'" (quoting from *United States v. Heinemann*, 801 F.2d 86, 93 (2d Cir.1986)). In this case, paragraph 15 of the indictment charged that "[i]t was a further part of the conspiracy that on or about December 14, 1995, at the defendant William Peterson's direction, coconspirators used fire and explosives, to wit: Molotov Cocktails, to damage Bottles & Cases and Bottle Bargains." Muscat was aware of this objective of the conspiracy, an objective that Peterson directed and facilitated.

Moreover, the record reveals that, contrary to the defendant's assertions, at least one of the co-conspirators was aware of the object of the criminal conspiracy charged in Count One. Jesse Hart, a coconspirator, testified as follows:

Q All right. Now, at any meeting did Mr. Peterson ever tell you why he wanted [the stores set afire]?

A Yeah. Yes, he did.

\* \* \* \* \* \*

Q What did he say as to why he wanted it done?

A That the guy was cutting into his business.

Q What guy?

A The buy that owns Bottles & Cases and Bottle Bargains was cutting into his business.

Q At any point prior to the fires, did you report back to Billy and tell him whether it was a go or not a go?

A Yes, I told him.

Q Did Mr. Peterson tell you when he wanted this done?

A Yes, he did.

Q What did he say?

A He told me that he wanted it done before the holidays because that's a big revenue time.

Q That's the big what time?

A Revenue. That's when they make big money.

Tr. at 627–28.

Hart's testimony establishes that Peterson directed Hart to burn down Bottles & Cases and Bottle Bargains because those stores were "cutting" into Peterson's business. The proof refuted Peterson's argument that those who threw the Molotov cocktails did not know this. Hart knew the reason for the Peterson-directed arsons, and Hart conspired with and aided and abetted those who threw the Molotov cocktails.

Here, the evidence of reasonable foreseeability is compelling. The Government adduced direct evidence that Peterson knew that his co-conspirators-directed and paid by him to commit the arsons—would have to break a glass window and inferentially he knew that they would have to throw incendiary devices in through the holes in the glass window. Such a device had to be in the nature of an improvised Molotov cocktail, namely, a bottle containing fuel, with a wick. The proof showed that Peterson not only knew that, he hired and paid his co-conspirators to do it.

It is clear, and the Court finds, that a rational trier of fact could have found the essential elements of the crimes alleged in Counts Six and Seven—aiding and abetting in the use and carrying of Molotov cocktails to commit arson and/or the *Pinkerton* theory of liability—beyond a reasonable doubt.

## II. *AS TO THE RULE 33 MOTION*

### A. *Defendant's Contentions*

 The defendant moves, pursuant to Fed. R.Crim. 33 for a new trial, as to all the counts, based upon the authority of *United States v. Sanchez,* 969 F.2d 1409 (2d Cir.1992). The defendant contends that the jury verdict, "based principally, if not exclusively, upon the testimony of Jesse Hart, can only be perceived as a miscarriage of justice and that the jury has reached a seriously erroneous result." In this regard, counsel for Peterson asserts that:

> The only link of Mr. Peterson to the substantive crimes charged in this indictment is contained in the testimony of Jesse Hart. It is Hart, and only Hart, to whom Peterson is alleged to have spoken and it is Hart and only Hart's version of these conversations upon which a conviction rests.

> I need not review in detail what kind of a human being Hart was throughout the period of the conspiracy alleged. His history and character were thoroughly brought out at trial and even Mr. Lato referring to his cocaine use referred to Hart (and Muscat) as having their brains fried by substance abuse. In sum, I submit that the court should find Hart (and Muscat) incredible as a matter of law. I therefore ask the court to exercise its broad discretion and order a new trial. Under the circumstances and facts of this case I submit this verdict was against the weight of the evidence.

### B. *The Rule 33 Standard*

 Rule 33 provides that "on a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require." As recently stated by the Second Circuit in *United States v. Ferguson,* 246 F.3d 129, 133, 134 (2d Cir. 2001) and noted by the Government in its December 12, 2001 letter, the Rule 33 standard is as follows:

> The rule by its terms gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992). The district court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurping" the role of the jury. *[United States v.] Autuori,* 212 F.3d [105,] 120 [(2d Cir.2000)]. Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, "(i)t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez,* 969 F.2d at 1414. *An example of exceptional circumstances is where testimony is "patently incredible or defies physical realities,"* although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.

> *The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. See San-chez,* 969 F.2d at 1414. The trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. *Id.* ... The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. *See id.* "There must be a real concern that an innocent person may have been convicted." *Id.* Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority "sparingly" and in "the most extraordinary cir-

cumstances." *Sanchez,* 969 F.2d at 1414 (emphasis added).

## C. *Discussion*

In this case, notwithstanding the checkered past and poor character of Hart-a situation not uncommon in the criminal justice field-in view of the overwhelming corroborative evidence, his testimony could not be found to be incredible as a matter of law. The Court finds no miscarriage of justice involving Hart's testimony. On the contrary, there is substantial testimony and scientific evidence linking Peterson to this conspiracy, including the shooting in 1991, the two arsons in 1995 and, with reasonable foreseeability, the use of Molotov cocktails in perpetrating the arsons.

█ It is well-established that a conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt. *United States v. Diaz,* 176 F.3d 52, 92 (2d Cir.1999). In fact, "any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the evidence, not to its sufficiency, and a challenge to 'the weight is a matter for argument to the jury ...'" *Diaz,* 176 F.3d at 92 (quoting *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.1989)). Here there is substantial corroboration of Hart's testimony.

█ Indeed, the case relied upon by the defendant, *United States v. Sanchez,* 969 F.2d 1409 (2d Cir.1992), does not support the defendant's position. In *Sanchez* the district judge set aside a guilty verdict and ordered a new trial based on his determination that perjured testimony was given by three police officers. However, the Second Circuit reversed and reinstated the jury verdict. The Court reiterated the Rule:

It long has been our rule that trial courts "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment. *See United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir.1989). Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation. *See e.g., Holland v. Allied Structural Steel Co.,* 539 F.2d 476, 483 (5th Cir.1976), *cert. denied,* 429 U.S. 1105, 97 S.Ct. 1136, 51 L.Ed.2d 557 (1977); *Zollman v. Symington Wayne Corp.,* 438 F.2d 28, 31–32 (7th Cir.), *cert. denied,* 404 U.S. 827, 92 S.Ct. 59, 30 L.Ed.2d 55 (1971).... The test is whether "it would be a manifest injustice to let the guilty verdict stand." *United States v. Reed,* 875 F.2d 107, 114 (7th Cir.1989).

*Id.* at 1414.

Reviewing the evidence as a whole, the Court finds that Hart's testimony is not patently incredible nor does it defy physical realities. There is no "manifest injustice" with regard to the convictions in this case. The defendant's Rule 33 motion is denied.

## III. *AS TO THE "FUTURE" CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL*

Finally, counsel for Peterson moves the Court for a new trial "based upon the claim the counsel was ineffective at trial and to preserve said issue for appellate review should same be necessary or advised. In sum, I will not personally fail to assert same and thus potentially waive any

claim that could be asserted by Mr. Peterson.... I do not want to effectuate any waiver of such claims, and ask the court to so find as such."

While Peterson's potential claim of ineffective assistance of trial counsel may be premature, *see, e.g., United States v. Pena,* 233 F.3d 170, 174, n. 6 (2d Cir.2000), insofar as this Court has the power, it finds he has not waived such a claim.

## IV. *CONCLUSION*

For the reasons set forth above, the Court denies the defendant's motion for a judgment of acquittal pursuant to Rule 29 and denies the defendant's motion for a new trial pursuant to Rule 33. The jury's verdict finding the defendant guilty on all seven counts will stand.

As stated previously, the defendant will be sentenced on Friday, February 22, 2002 at 10:00 a.m.

**SO ORDERED.**