UNITED STATES of America,

v.

**William PETERSON, also known as "Crazy Billy", Defendant.**

No. CR–00–1260(ADS).

United States District Court, E.D. New York.

Nov. 16, 2002.

Roslynn R. Mauskopf, United States Attorney, by Leonard Lato, Assistant United States Attorney, Brooklyn, NY, for U.S.

Dershowitz, Eiger & Adelson, P.C., New York, NY (Nathan Z. Dershowitz, Alan Dershowitz, Amy Adelson, and. Daniela Klare Elliott, of Counsel), for defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

In this case, a jury convicted the defendant William Peterson ("Peterson" or the "defendant") of extortion and conspiracy to fire bomb two liquor stores. Presently before the Court is a motion by the defendant pursuant to Rule 33 of the Federal Rules of Criminal Procedure for a new trial based upon newly discovered evidence—an alleged conflict of interest arising from his trial counsel's misdemeanor conviction in the Eastern District of New York for failing to file a tax return. The Court has received affidavits and conducted an evidentiary hearing at which the defendant, his trial counsel and other witnesses testified over a period of four days. This decision contains the Court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. The Trial Counsel's Representation of the Defendant

#### 1. The State Investigation

In or about December of 1999, the defendant retained David W. Clayton, Esq. to represent him in connection with a state investigation involving "fire bombings" that took place on December 14, 1995 at two liquor stores in Suffolk County, New York. At that time, Clayton advised the defendant that his fee was $300 per hour and that he did not need a retainer because the state was only conducting an investigation.

Shortly thereafter, Clayton discussed the state investigation with the assistant district attorney handling the case, one Jeremy Scheleppi of the Suffolk County District Attorney's Office. At that time, they discussed the strength of the case against the defendant and a potential plea offer. As to the strength of the case, Clayton told Scheleppi that the state could not make out a *prima facie* case against the defendant because it was based only on uncorroborated accomplice testimony which was insufficient under New York law. As to a potential plea, Scheleppi stated that any offer must involve a felony and incarceration. Thereafter, Clayton advised the defendant of Scheleppi's position. In response, the defendant stated that he was innocent and that he would not go to jail for something that he did not do.

#### 2. The Federal Investigation

On or about October 4, 2000, the Suffolk County District Attorney's Office referred its investigation involving the defendant to the Office of the United States Attorney for the Eastern District of New York. On October 19, 2000, Clayton spoke with Assistant United States Attorney Leonard Lato who was assigned to the case. At that time, Lato told Clayton that the government would not pursue the case if the defendant negotiated a plea with the state. Within a few days, Clayton advised the defendant of this conversation.

On November 21, 2000, Clayton again spoke with Lato. At that time, Lato told

Clayton that the government would defer its prosecution if the defendant entered a plea of guilty with the state involving a three, four, or five year jail sentence. On November 27, 2000, Clayton met with the defendant and advised him of the November 21, 2000 plea discussions. In response, the defendant stated that he was not interested in a plea involving a term of incarceration. Also, Clayton reviewed the applicable statutes with the defendant and explained to him that in a worst case scenario he could be sentenced to life if convicted of the two 18 U.S.C. § 924(c) counts involving destructive devices.

### 3. The Pre–Trial Proceedings

On December 12, 2000, a federal grand jury indicted the defendant. The indictment contained seven counts. Count one charged a conspiracy to obstruct interstate commerce by threats and violence involving two liquor stores, Bottles & Cases and Bottle Bargains. Count two charged obstruction of interstate commerce by threats and violence involving arson that took place at the above-noted liquor stores. Count three charged the use of fire and explosives to obstruct interstate commerce involving the crimes alleged in counts one and two. Counts four and five charged arson at the above-noted liquor stores. Counts six and seven charged the use of destructive devices, Molotov Cocktails, with regard to the arson charged in counts four and five. On December 27, 2000, United States Magistrate Judge William D. Wall arraigned the defendant on the indictment.

On October 2, 2001, the government filed a superceding indictment. The superceding indictment charged the same counts in the indictment but expanded the scope of the extortion conspiracy to include another owner of a liquor store. On October 12, 2001, the Court denied the defendant's motion to strike the overt acts of the conspiracy referred to in paragraphs 9 through 15 of the superceding indictment and the references to the defendant as "Crazy Billy". *See United States v. Peterson,* 168 F.Supp.2d 51 (E.D.N.Y.2001).

### 4. The Trial

On November 15, 2001, the jury trial commenced. A summary of the evidence at trial is contained in the Court's decision denying the defendant's motion for post-verdict relief. *See United States v. Peterson,* 190 F.Supp.2d 343, 347–354 (E.D.N.Y. 2002). Familiarity with this decision is presumed. On November 27, 2001, the jury convicted the defendant on all counts in the superceding indictment.

### 5. The Post–Trial Proceedings

After the conviction, Clayton orally requested an extension beyond the seven day period to move for relief pursuant to Rule 29 of the Federal Rules of Criminal Procedure. By letter dated November 30, 2001, Clayton requested an extension beyond the seven day period to move for relief pursuant to Rule 33 and, also, specifically to preserve his client's right to raise a claim for ineffective assistance of counsel in a Rule 33 motion. The Court granted these requests and extended the seven day periods until December 14, 2001.

On or about December 14, 2001, the defendant discharged Clayton as his attorney and retained Ronald G. Russo, Esq. of Herzfeld & Rubin, P.C. Shortly thereafter, Russo filed a notice of appearance on behalf of the defendant. On or about January 22, 2002, the defendant relieved Russo as his attorney and retained Nathan Z. Dershowitz, Esq. of Dershowitz, Eiger & Adelson, P.C.

On January 25, 2002, the Court denied the defendant's motion for judgment of acquittal under Rule 29 and his motion for a new trial in the interests of justice under Rule 33. *Peterson,* 190 F.Supp.2d at 343.

On that date, the defendant moved for a new trial under Rule 33 based upon newly discovered evidence, a claim of ineffective assistance of counsel. On March 6, 2002, the Court directed that the parties appear for an evidentiary hearing on the motion for a new trial. Between June 5, 2002 and July 2, 2002, the Court held a four day evidentiary hearing. Thereafter, the Court permitted the parties to submit additional papers in support of their respective positions.

## B. The Clayton Tax Investigation

In or about March of 1999, the Criminal Tax Unit of the United States Department of Justice (the "Tax Unit") began investigating Clayton for failing to pay taxes in the total amount of $100,500 for years 1993, 1994 and 1995. Within a few weeks, the Tax Unit referred the matter to the United States Attorney's Office for the Eastern District of New York.

During the government's investigation of Clayton, he represented four individuals who were charged with crimes in the Eastern District of New York. The last names of the individuals were: *Garone, McKay, Okun* and *Zangrillo*. The *McKay* case was assigned to this Court. On May 27, 1999, the government submitted a letter in *McKay,* apparently under seal, requesting that the Court disqualify Clayton or conduct a *Curcio* hearing. Clayton withdrew as soon as the letter was submitted and a *Curcio* hearing was never conducted.

On February 24, 2000, Clayton pleaded guilty before United States Magistrate Judge Arlene R. Lindsay to a misdemeanor information charging him with failing to file a tax return for 1993. *United States v. Clayton,* No. 00–83, at 11 (E.D.N.Y. Feb. 24, 2000). On September 7, 2000, United States Magistrate Judge Michael L. Orenstein sentenced Clayton to three years of probation with two hundred hours of community service. *United States v. Clayton,*

No. 00–83, at 17 (E.D.N.Y. Sept. 7, 2000). Presently, Clayton owes back taxes, interest and penalties in excess of $500,000 to the Internal Revenue Service (the "IRS") and $176,000 to the New York State tax authorities. Pursuant to the plea agreement, Clayton is negotiating with the civil authorities to pay his unpaid taxes.

## C. The Disputed Material Facts

There were three areas of factual dispute presented to the Court: (1) whether Clayton advised the defendant of his conviction and tax problems; (2) whether Clayton advised the defendant of the plea negotiations with the state and federal prosecutors; and (3) whether Clayton advised the defendant of the mandatory life sentence if found guilty of counts six and seven in the indictment.

### 1. As to Clayton's Conviction and Tax Problems

With regard to Clayton's tax conviction, the Court again notes that he pleaded guilty to the misdemeanor charge of failing to file a tax return on February 24, 2000. He was sentenced to probation on September 7, 2000. Also, Clayton is not cooperating with the government.

At the hearing, Clayton testified that shortly after his conviction in February of 2000 the defendant told him that he read an article in Newsday about his conviction for failing to file a tax return. Clayton stated that he explained to the defendant that he made a mistake; that his law license would not be affected; and that he hoped that the defendant would continue to let him represent him. After this explanation, the defendant acted graciously and stated that he still wanted Clayton to represent him.

In particular, Clayton testified:

Q At the time of your plea, in other words, the next day or shortly thereaf-

ter, did you read about what had happened in the newspapers?

A    I did, on the 23rd of February.

Q    Which newspaper did you see this in?

A    Newsday.

Q    Did you ever discuss or look at that article with Mr. Peterson?

.      .      .      .      .

A    Not reviewed the article with Mr. Peterson, but discussed it.  He brought it to my attention.  He had read it.

Q    About when did this occur, this conversation with Mr. Peterson?

A    I would say it was within two weeks of its publication.

Q    Where did this conversation take place?

A    Over in my office, in Hauppauge.

Q    Who was present at the time of the conversation?

A    Just Mr. Peterson and I.

Q    What did you and he say to each other with respect to his finding or his having read this article and your tax problems?

A    Well, he said he had read it, and he was disappointed.  He hoped that I was going to be all right.  He was encouraging.  I told him that I had screwed up. That's not exactly the word I used with him, and that I hoped that he would permit me to continue to represent him. That I expected to receive an outcome in my personal matters down the road that would not affect my license to practice law.  And he was really quite, quite gracious to me and more than decent about it.  He was kind.

.      .      .      .      .

Q    Did he ask you at that point to step aside, or words to that effect?

A    No, Sir.

Q    Now, at the time this conversation was going on with Mr. Peterson, was there any federal investigation at this point?

A    No, not at all.

(7/1/02 at 186–188).*

In contrast, the defendant testified that he did not know about Clayton's conviction or his disciplinary proceedings until December of 2001.  In particular, the defendant stated that he first learned of Clayton's tax problems from a friend.  After learning of Clayton's tax problems, the defendant allegedly found the Newsday article on Clayton's conviction while searching in the Newsday archives on the Internet.  The following defense witnesses also testified that they did not know about Clayton's conviction:  Edward Little, Esq., Dr. Robert Rubin, Keith Peterson, Dr. Kerry Peterson and Ronald Gottlieb.

After hearing and viewing the defendant and Clayton, the Court credits Clayton's account of the events.  In doing so, the Court relies both on its assessment of the demeanor and credibility of the two witnesses and on the totality of the circumstances.  First, the defendant testified that he does not regularly read newspapers.  Yet, he stated that his son and friends faxed him articles—which he read—stating he faced a life sentence. (*Id.* at 408).

Also, Clayton's conviction certainly would be of particular interest to the defendant, his family and many devoted friends.  Further, it is reasonable to believe that the defendant would still want Clayton as his attorney even after he found out about his misdemeanor tax conviction because Clayton successfully represented him during the state investigation which was not pursued.  In addition, there

---

* Citations to the evidentiary hearing on the motion for a new trial which took place between June 5, 2002 and July 2, 2002 are referred to by date and page.

was obviously good feelings between Clayton and the defendant as exhibited by the complimentary notes and gifts that the defendant gave Clayton. On that point, Clayton testified as follows:

Q At any point during your representation of Mr. Peterson during the federal case, did he ever hand you notes complementing you on what type of a job that you were doing?

. . . . .

A Oh, before the trial, yeah, he sent me a couple of notes, yeah.

Q I'm going to show you Government Exhibit 4 for identification, it's a photocopy of what appear to be pages in your file that you turned over to Mr. Dershowitz. (Handing.) There are 3 pages that are stapled together, they were not so in the original. I stapled those together.

A Okay. Yeah. I see them.

Q Who wrote you those notes?

A This is all from Billy, Mr. Peterson, Bill Peterson.

Q How do you know that they're from William Peterson?

A I recognize his handwriting. It's on his stationary. And I'm sure that I thanked him for his generosity.

. . . . .

Q The first note, do you know about when Mr. Peterson gave that to you?

A I think that was sometime—let me just look at both of them. This first one, I think, my recollection is that this was after the federal case started. The other one—

Q Let's talk about the first one.

A Yeah.

Q What does it say?

. . . . .

A 'Dave, thanks to you I sleep at night. Have one on me. Regards, Crazy Billy.'

Q The second note, about when did Mr. Peterson give that to you?

A This one would have been around the, my best recollection, around the summer while the state case was still going on. My birthday is July 23, and—

Q This is of the year 2000, correct?

A Yes. This would have been the year 2000.

Q And what does it say?

A It's from the desk of Billy Peterson, 'Dave, you're the best looking 50 year old I know.' I was 60. 'Let's have dinner one night. Meantime, have a toast on me. Thanks for everything, Billy.'

(7/1/02 at 216–218).

Finally, the Court finds that the defendant had a strong incentive to testify favorably at the evidentiary hearing because he now faces a potential life sentence. For the above-stated reasons, the Court finds that the defendant was aware of Clayton's misdemeanor conviction prior to the defendant's trial in November of 2001 and that he knowingly permitted Clayton to represent him during the trial.

### 2. As to the Plea Negotiations

#### a. The State Plea Offer

Clayton testified that Scheleppi told him that any plea offer to the defendant must involve a felony and incarceration. Clayton stated that he advised the defendant of this potential offer and that the defendant responded that he would not go to jail for something that he did not do. In contrast, the defendant testified that Clayton never told him of this potential offer.

The Court credits Clayton's testimony. Clayton's account of the events is credible and makes sense. In particular, Clayton advised the defendant that the state could not make out a *prima facie* case against him. The state had neither arrested nor charged the defendant with any crime. At that point, the defendant had no incentive

to plea guilty to an offense involving a term of incarceration. As such, the Court finds that Clayton told the defendant of the potential plea offer with the state and that the defendant rejected it.

### b. The Federal Pre–Indictment Plea Offer

Clayton testified that on October 19, 2000, Lato told him that if the defendant worked out a deal with the state, the government would not pursue the case. Clayton further stated that on November 21, 2000, Lato told him that if the defendant entered a plea of guilty with the state involving a three, four or five year jail sentence, the government would defer its prosecution. Clayton stated that he advised the defendant of his first conversation with Lato within a couple of days and advised the defendant of the second conversation with Lato on November 27, 2000. On both occasions, the defendant responded that he was not interested in a plea involving a term of incarceration. In contrast, the defendant testified that Clayton never discussed these potential plea offers with him.

The Court credits Clayton's account of the events. Again, Clayton's testimony was believable and his account made sense. In particular, the Court notes that throughout the state and federal investigations the defendant stated persistently and emphatically that he was not guilty of these crimes and would not consent to any plea involving incarceration. Also, the defendant told his family and friends that he was innocent. Further, the defendant was under no pressure to seriously consider a plea involving a term of incarceration because there was no indictment pending against him. Accordingly, the Court finds that Clayton advised the defendant of the pre-indictment offers and with this knowledge the defendant rejected them.

### c. The Federal Post–Indictment Plea Offer

At the hearing, the defendant testified that Clayton advised him that the government was willing to negotiate a plea agreement involving a ten year term of incarceration. In particular, the defendant testified:

Q  Did the subject of a plea come up at all during the course of the trial?

A  Yes.

Q  And can you tell me what those discussions were and who they were with?

A  It was with—I had the discussion with David Clayton. He had said to me that, in passing, Mr. Lato, whether it was passed a remark or said, you know what? If you want to sit down and resolve this, we can do it with ten years or plus. You know, I don't even know if my people would accept that but, you know, run it by Mr. Peterson and see what he says. So Mr. Clayton told me that. And I said, well, what do you think? And he goes, well, by the time we're done, I don't think—there's no way if you are found guilty that you are going to get any more than 10 years anyway, because the things that he told me were going to—the gun was going to be spoliated out and the charges are going to be knocked out, so what's the difference? Now he's saying ten years plus, and we don't even know if that's a real deal. And that was the end of the conversation.

(7/2/02 at 371–372).

### 3. As to the Mandatory Life Sentence

Clayton testified that he told the defendant he faced a mandatory life sentence.

Q  When was the first time that you ever told him that if he is convicted of all the charges, he could face a mandatory life?

A Mandatory life in those terms?

Q Yes.

A I would say once the initial indictment was handed up in the form it was handed up and analyzing that and seeing what it looked like, within that period of time.

Q So you understood right away that if convicted of all of the counts, it was possible that he could get mandatory life?

A I understood that, yeah, sure.

Q You conveyed that to him?

A Yes.

(6/27/02 at 48).

A November 21, 2000 note in Clayton's file reveals that he wrote among other things "2 arsons . . . crap shoot-life." (Defendant's Ex. H). Clayton explained this entry:

Q Who was saying that, you or me?

A That's you saying that, says it's two arsons,—O-L-O-T, I got slash M-O-L-O-T, Molotov meaning. The next phrase is but crapshoot-life.

Q What does that mean, crapshoot-life?

A It means like every other jury trial, you could win it or lose it. It's no guarantees. It's a crapshoot.

Q And if you lose, what do your notes say?

A Life, meaning life in prison.

(7/1/02 at 201).

Also, a November 27, 2000 note in Clayton's file contains an entry describing the statute which was the basis for the mandatory life sentence. As to this note, Clayton testified:

Q With respect to the statutes, what does that note mean fill Bill in with respect to the statutes?

A My habit is, and I did in this case, is to make copies of the relevant statutes of the offenses charged, copy for myself for the file and I always make an extra copy for the client so that we can go through it and explain everything and what it's all about and that's what I did in this case.

Q Now, I'm going to show you again what's part of Government Exhibit H (Handing.) Are those copies of the statutes that you went over with Mr. Peterson?

A Yes, they are.

Q Did you go over it with him on that date, November 27?

A Yes.

Q Now, the first page in front of you, what's the statute reading at the top of the page?

A This is the firearms, Title 18 United States Code section 924 and specifically subsection (c)(1)(A), and in particular the destructive device.

Q Did you make any note on that statute? Did you highlight it in any way where it talks about destructive devices?

A It doesn't show it on here, but the darkened area of this copy is in highlighter, that yellow highlighter, and I specifically underlined destructive device which incorporates Molotov cocktail, second or subsequent conviction, the person if convicted shall be sentenced to life.

(7/1/02 at 204–205).

Significantly, there is a note in Clayton's file dated October 11, 2001, referring to a letter sent by Clayton to Judge Spatt with a copy to the defendant containing a reference that "conviction could result in sentence of life in prison." (6/5/02 at 93). The Court notes that it received this letter.

Peter Mayer, the Grand Jury Bureau Chief for the Office of the Suffolk County District Attorney and a former law partner of David W. Clayton, testified to a revealing conversation with the defendant shortly before November of 2001, just prior to the trial:

Q When you were talking to him about your running for judgeship, did the criminal case against Mr. Peterson come up?

A Yes. We chatted, and I talked to him about the sign and he was very willing to do it, and he was gracious about that and I thanked him for that. And he got into the subject area of the case during the course of that conversation.

Q Please tell the Court what you and Mr. Peterson said to each other with respect to his case?

A The sum and substance of that was that he said you know, 'I'm outraged by what they're trying to do to me. I'm going to try this case. I didn't do it. And we're going to win.' And I listened. He was intense in narrating that. I then took a moment to say, you know, 'I wish you all the best, Bill. I just want to say to you, do you understand what the federal system is all about? By that I mean, you know, in the federal system a sentence means a sentence. In this case you know, it's a life sentence. And it doesn't mean it's not life if you're a nice guy or a community guy or you have a good family. Life means life. That's the downside.' And he basically said, 'yeah, I know, I know, but you know, I didn't do it and I'm, these guys, these low-lifes, are the ones testifying against me. I got—I'm confident in Dave. I got a good lawyer, and we're going to win the case.'

(7/1/02 at 305–306).

In addition, Mayer furnished another indication the defendant was more than satisfied with Clayton's representation during the trial:

Q At some point during the trial, were you in the courthouse tending to a matter of yours which you were involved in private practice?

A Well, I've been in this courthouse many times during my private practice years, yes.

Q Well, let me rephrase the question. I'm sure that I was unclear. At some point when Mr. Peterson's trial was ongoing, did you stick your head in the courtroom to see what was going on?

A I did.

Q And at some point did you engage Mr. Peterson in conversation at the break during the trial?

A My recollection, I came in during trial, having had some other matter in this courthouse, and it was in the afternoon, the Court was breaking for the day. I had stepped around to the counsel table. Billy was getting up, gathering his papers, David was gathering his papers and I remember Bill saying, 'we had a great day today, we had a great day. We're going to win. And we had a great day because I have a great lawyer.'

(*Id.* at 306–307).

If there was any doubt as to this factual issue, it was resolved when the defendant testified at the hearing. He testified that shortly after he was arraigned he read articles in the newspapers that he was "facing life":

Q You testified earlier that you don't regularly read the newspapers, correct?

A Correct.

Q But after you were indicted and arraigned you did look at some newspaper articles, correct?

A They were faxed to me.

Q And in those articles you learned that you could be looking at life, correct?

A That's what it said.

Q And this was shortly after you were arraigned on the indictment, correct?

A Yes, Sir.

Q You read some articles in the newspaper that said you could be looking at life, correct?

A I read no articles in the newspaper. They were faxed to me by my son and friends.

Q Well, you read faxes of newspaper articles saying that you could be looking at life, correct?

A Facing life, I think it said.

(7/2/02 at 408).

The defendant also conceded that Clayton told him he was "facing life, worst case scenario" in an October 2001 conference in which his son Keith Peterson was present. (*Id.* at 357). In any event, the defendant—at all times—declined to consider any plea until the guilty verdict was rendered:

Q Now, when you went to see Mr. Little, did you discuss with him about the possibility of a plea?

A *Never.*

Q Did you say to Mr. Little, maybe I can work out a plea?

A No.

.    .    .    .    .

Q But there were no thoughts about taking a plea, correct?

A No.

Q You were going to trial, correct?

A Yes.

(*Id.* at 421–423 (emphasis added)).

Based upon the foregoing, the Court finds that Clayton advised the defendant that he faced a mandatory life sentence if convicted on all the counts in the indictment.

## II.  DISCUSSION

### A.  The Rule 33 Standard

On motion of a defendant and in the interest of justice, Rule 33 permits a district court to grant a new trial. Fed. R.Crim.P. 33. A new trial motion must be made within seven days after a verdict or finding of guilty or within such further time as the district court may fix during the seven day period. *Id.* However, if the new trial motion is based on the ground of "newly discovered evidence", it may be made within three years after a verdict or finding of guilty. *Id.*

The time limits in Rule 33 are jurisdictional. *United States v. Dukes,* 727 F.2d 34, 38 (2d Cir.1984). A district court is without discretion to grant a motion for a new trial that is not timely filed. *Id.* ("If a motion is not timely filed, the district court lacks power to consider it."). Accordingly, the threshold legal issue that the Court must address is whether the defendant's claim for ineffective assistance of counsel presents "newly discovered evidence" within the meaning of Rule 33. For if it does not, the Court has no power to consider the claim.

### B.  The Claim of Ineffective Assistance of Counsel

The Second Circuit has held that "ineffective assistance claims do not present new evidence within the meaning of Rule 33." *United States v. Castillo,* 14 F.3d 802, 805 (2d Cir.1994) (citing *Dukes,* 727 F.2d at 39). The defendant argues that neither *Castillo* nor *Dukes* forecloses consideration of the defendant's claim of Clayton's alleged conflict of interest based upon information learned after trial. The Court disagrees.

In *Castillo,* the defendant made a motion for a new trial under Rule 33 more than seven days after the verdict. *Castillo,* 14 F.3d at 805. The motion was based on ineffective assistance of counsel. *Id.* at 804. The defendant set forth two grounds for this claim: (1) counsel's alleged failure to permit him to testify at trial; and (2) counsel's alleged failure to file a motion for a new trial within the seven day time limit. *Id.*

The first ground was based upon facts known to the defendant at the time of trial—the failure to permit the defendant to testify—while the second ground involved facts learned by the defendant after trial—the failure to make a post-trial motion. When confronted with these two grounds, the Second Circuit stated that "ineffective assistance claims do not present new evidence within the meaning of Rule 33." *Id.* at 805. The Court reads *Castillo* as the rule in the Second Circuit that ineffective assistance of counsel claims, whether based on facts known to the defendant at the time of trial or facts learned by the defendant after trial, do not present newly discovered evidence under Rule 33.

Other district courts in this Circuit agree with this interpretation. *United States v. Farrah*, 128 F.Supp.2d 103, 115 n. 2 (D.Conn.2001) ("The government notes, correctly, that the Second Circuit has held that a claim of ineffective assistance is not newly discovered evidence within the meaning of Rule 33 and therefore, does not provide grounds for a new trial under this rule.") (citing *Castillo* and *Dukes* ); *United States v. Paul*, No. 95–48, 2000 WL 1731339, *1 (D.Conn. Nov.6, 2000) ("Ineffective assistance of counsel claims do not come within the purview of newly discovered evidence.") (citing *Castillo* and *Dukes* ); *United States v. Leon–Lopez*, 891 F.Supp. 138, 147 (S.D.N.Y.1995) ("Ineffective assistance claims do not, however, present new evidence within the meaning of Rule 33.") (citing *Castillo* and *Dukes* ); *United States v. Risatti*, 638 F.Supp. 300 (E.D.N.Y.1986) (stating that "a claim of ineffective assistance of counsel does not constitute 'newly discovered evidence.' ") (citing *Dukes* ).

Leading commentators also support this interpretation:

> While a defendant may challenge counsel's performance in a Rule 33 motion, counsel's ineffectiveness does not constitute newly discovered evidence. *United States v. Dukes*, 727 F.2d 34, 39 (2d Cir.1984); *see also United States v. Castillo*, 14 F.3d 802, 805 (2d Cir.1994). Therefore, to raise an ineffectiveness claim in a Rule 33 motion, the defendant must move within the time limit of Rule 33 for motions on grounds other than newly discovered evidence, *i.e.*, within seven days of the verdict unless the time is extended by the court within the seven-day period.

Gordon Mehler, .U.S.D.J. John Gleeson & David C. James, Federal Criminal Practice: A Second Circuit Handbook § 26–3 (2002 ed.). Furthermore, the defendant cites no decision within this Circuit which contravenes this reading of *Castillo* and the Court is unable to find such a decision.

This interpretation is also consistent with the general standard of granting a new trial for newly discovered evidence under Rule 33. "[A] district court must exercise great caution in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only *in the most extraordinary circumstances.*" *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir.1993) (internal quotation marks and citations omitted). To grant relief, the defendant must show that the newly discovered evidence: (1) "could not have been discovered, exercising due diligence, before or during trial"; (2) is "material"; (3) is "non-cumulative"; and (4) if admitted at trial, would probably have led to an acquittal. *United States v. Gallego*, 191 F.3d 156, 161 (2d Cir.1999) (internal quotation marks and citations omitted); *see also United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir.1992).

With regard to the fourth element, Clayton's conviction and tax problems do not go to the defendant's guilt or innocence but instead present a potential conflict of interest situation. *See Dukes*, 727

F.2d at 39 ("None [of the alleged errors] cite[ ] to newly discovered evidence going to Dukes' innocence or guilt."). Counsel's performance has nothing to do with a defendant's guilt or innocence. *But cf. United States v. Parker*, 903 F.2d 91, 102–103 (2d Cir.1990) (statement that the defendant was not involved in the crimes goes to guilt or innocence); *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980) (document that casts doubt on the culpability of the defendant goes to guilt or innocence); *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975) (tangible evidence that exonerates a defendant goes to guilt or innocence); *see also United States v. Wallach*, 935 F.2d 445, 457 (2d Cir.1991) (false testimony by the government goes to defendant's guilt or innocence). For the above-stated reasons, the alleged conflict of interest does not present new evidence within the meaning of Rule 33.

■ Even if a claim of ineffective assistance of counsel based on a conflict of interest could present "newly discovered evidence" within the meaning of Rule 33, the Court finds that the defendant knew of Clayton's conviction before trial. *See supra* Part I.C.1. As such, the basis for the defendant's motion for a new trial does not involve newly discovered evidence. Accordingly, the Court does not have jurisdiction to render a decision on this motion.

The defendant asks the Court to convert the Rule 33 motion into a habeas petition pursuant to 28 U.S.C. § 2241(c)(1) or upon sentencing pursuant to 28 U.S.C. § 2255, if the Court finds that the defendant's claim has merit and that Rule 33 is not the proper procedural mechanism to raise the claim. The Court denies this request because—as explained below—the claim for ineffective assistance of counsel based on a conflict of interest is without merit.

## C. The Merits of the Claim of Ineffective Assistance of Counsel

### 1. The Right to Conflict–Free Counsel

The Sixth Amendment mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "[T]his right to counsel includes a criminal defendant's qualified right to be represented by the counsel of his choice." *Lainfiesta v. Artuz*, 253 F.3d 151, 154 (2d Cir.2001) (citing *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988)). However, this qualified right is supported by, among other things, the Sixth Amendment right to effective assistance of counsel. *See id.* "A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *United States v. Schwarz*, 283 F.3d 76, 90 (2d Cir.2002) (internal quotation marks and citations omitted). Where the potential for a conflict of interest arises, a court must "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *United States v. Levy*, 25 F.3d 146, 153 (2d Cir.1994) (citations omitted).

### 2. The *Per Se* Conflict of Interest

■ A *per se* conflict of interest exists: "(1) where the attorney was not licensed to practice law because he failed to satisfy the substantive requirements of admission to the bar, and (2) where the attorney was implicated in the defendant's crime." *United States v. Luciano*, 158 F.3d 655, 661 (2d Cir.1998). "The *per se* rule applies when an attorney is implicated in the crimes of his or her client since, in that event, the attorney cannot be free from

fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." *United States v. Fulton*, 5 F.3d 605, 611 (2d Cir.1993) (internal quotation marks and citation omitted).

██ The Second Circuit has repeatedly noted the limited reach of the *per se* rule. *Schwarz*, 283 F.3d at 96 (stating that *Fulton* belongs to the narrow category of *per se* conflicts of interest); *Levy*, 25 F.3d at 157 n. 8 ("[W]e have repeatedly stressed the limited reach of the *per se* rule, emphasizing that it applies only when a defendant's lawyer was unlicensed or had engaged in the defendant's crimes."). Because Clayton was licensed to practice law in the Eastern District of New York at the time he represented the defendant and Clayton was not implicated in the defendant's crime, the *per se* rule does not apply.

### 3. The District Court's Inquiry Obligation

██ "The Sixth Amendment requires automatic reversal ... when a trial court fails to conduct an inquiry after either a timely conflict objection, or if the court knows or reasonably should know [that] a particular conflict exists." *Levy*, 25 F.3d at 154 (internal quotation marks and citations omitted). In this case, neither trial counsel nor the government advised the Court of Clayton's conviction. Also, the Court did not know of Clayton's conviction prior to the disclosure following the defendant's guilty verdict.

Although the government submitted a letter on May 27, 1999, apparently under seal, requesting that the Court disqualify Clayton or conduct a *Curcio* hearing in another case, *United States v. McKay*, Clayton withdrew from that case as soon as the letter was submitted and a *Curcio* hearing was never conducted. At the time of the defendant's trial, the Court did not recall the contents of the letter. Moreover, the letter was submitted two and a half years prior to the trial of the defendant. As such, the Court had no reason to know of any potential conflict involving the defendant and Clayton, which would trigger an inquiry obligation.

### 4. The Actual Conflict of Interest

██ "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Schwarz*, 283 F.3d at 91 (internal quotation marks and citation omitted). *See also United States v. Kliti*, 156 F.3d 150, 153 n. 3 (2d Cir.1998); *United States v. Blau*, 159 F.3d 68, 75 (2d Cir.1998). The defendant argues that Clayton's prosecution and conviction by the same prosecutor's office that was proceeding against the defendant, his unresolved tax problems and his pending disciplinary proceeding created an actual conflict of interest. The Court disagrees.

First, the government's prosecution of Clayton was over on September 7, 2000 when Clayton was sentenced for the misdemeanor crime. The government began its investigation of the defendant on October 4, 2000. As such, Clayton had no reason to curry favor with the government during the pendency of the defendant's case for fear that the government may prosecute him more vigorously.

The defendant argues that *Levy*, 25 F.3d at 146 supports his position that Clayton labored under an actual conflict. It does not. *Levy* involved charges against a defendant for conspiracy to distribute heroin. *Id.* at 149. There, the defendant's trial counsel, among other things, was awaiting sentence during the pre-trial stage of the defendant's case for unrelated crimes

brought by the same prosecutor's office. *Id.* at 156. The Second Circuit held that a conflict existed during the pre-trial stage because trial counsel may believe that he had a personal interest in providing a weak defense for fear that if he vigorously advocated for the defendant, the government would prosecute him more zealously. *Id.*

Unlike the facts in *Levy,* where charges were still pending against trial counsel during the pre-trial stage, in the instant case the government began its investigation of the defendant after Clayton was sentenced. In *Levy,* the Second Circuit highlighted this crucial distinction explaining that the conflict existed when charges were pending against trial counsel before he was sentenced and not when charges were no longer pending. *See id.* ("Though [trial counsel] was sentenced before [the defendant's] trial began, the pendency of the charges against [trial counsel] created a conflict for the lawyer in properly representing [the defendant] during the pretrial stage of [the defendant's] case. . . .").

The defendant acknowledges this distinction but argues that it makes no difference because Clayton was on probation and this creates an inherent conflict of interest in his practicing law. The only support given for this argument is that Clayton's attorney advised Judge Orenstein during the sentence that he thought the grievance committee in the New York State Appellate Division, First Department took the position in the *Levy* case that counsel could not be on probation and practice law, under the theory that he would be serving two masters, his client and his probation officer, and there might be an inherent conflict. The defendant does not argue, nor can he, that Clayton had a legitimate fear that if he made a strong defense in the *Peterson* case, the government could or would recommend to the United States Department of Probation that it seek to revoke or modify his probation. Also, to accept the defendant's argument, the Court must conclude that there exists a conflict in every case that Clayton represents a defendant in a criminal case during the term of his three year probation. No case law supports such a conclusion. Nor will the Court make such a determination.

As to Clayton's unresolved tax problems, the defendant argues that Clayton took the case to trial rather than engage in plea negotiations because he needed money to pay for his past due taxes. In the Court's view, Clayton's unresolved tax problems did not create an actual conflict in the form of a financial motive to take the defendant's case to trial rather than be resolved by a plea. In this case, there is no doubt that the defendant was resolved to go to trial. The defendant unequivocally and persistently stated during the state and federal investigations that he was not going to jail for crimes that he did not commit. The defendant steadfastly told his family and friends that he was innocent. There was no indication whatsoever that the defendant was willing to take a plea at any time during the state investigation or the pre-indictment stage of the federal investigation. Once indicted, the defendant still was not interested in a plea involving a term of incarceration. At that stage, the defendant told Clayton that "I wanted to go to trial to establish my innocence, and would not accept a ten year jail sentence. . . ." *See* Affidavit of William Peterson in support of the motion for a new trial executed on January 21, 2002 ¶ 18 (the "Peterson Affidavit"). At the hearing, the defendant still maintained his innocence, as is his right to do.

The defendant argues that *Schwarz,* 283 F.3d at 76 supports his position that Clayton labored under a financial conflict. It

does not. In *Schwarz,* the government charged the defendant, a police officer, with assaulting a victim in a bathroom at a police precinct. *Id.* at 79–80. There, the law firm of defendant's trial counsel had a $10,000,000 retainer agreement with the police officers' union, the Patrolman's Benevolent Association (the "PBA"). *Id.* at 91. During the criminal proceedings, the victim filed a civil lawsuit against the PBA alleging that the PBA through its agents and its president conspired to injure him and then covered it up. *Id.* The Second Circuit found an actual conflict existed between trial counsel's personal interest and professional obligation to the PBA and his representation of the defendant. *Id.* at 91–92. In particular, the defendant's interest in making a defense that would implicate another police officer in the assault—a strong, obvious interest—diverged with trial counsel's interest in refraining from any conduct that could harm the PBA, for example—making an argument that supported the conspiracy theory in the victim's civil lawsuit. *Id.* at 91–92.

In *Schwarz,* trial counsel had a personal interest and professional obligation to another client that differed from his criminal client. Also, trial counsel refrained from making a particular defense in the criminal case because it ran counter to another client's interest. In the instant case, Clayton did not have another client with an interest that differed from the defendant's interest and he did not refrain from making a particular defense because it diverged with another client's interest. As such, *Schwarz* does not support the defendant's position.

True, Clayton had financial concerns and significant debt to the IRS and state tax authorities during his representation of the defendant. The defendant's supposition that because of Clayton's financial problems, he avoided plea negotiations with the state and federal prosecutors in order to bill as many hours as possible, is pure speculation. This argument could be made for any attorney who has financial difficulties and bills by the hour. Most importantly, his theory runs counter to the fact that the defendant was not interested in any plea involving a term of incarceration and chose to go to trial for his own reasons.

Further, Clayton's unresolved disciplinary proceedings did not create an actual conflict. In conclusory fashion, the defendant contends that the outcome of the disciplinary proceedings could depend on the role taken by the government. The defendant states that the government could have given the state Disciplinary Committee more details of Clayton's conviction or could have notified the Disciplinary Committee that Clayton was not, as defendant alleges, complying with his obligation to pay back his outstanding taxes or could have referred the case to the state for criminal prosecution. This argument is without merit.

The Appellate Division, not the United States Attorney, is responsible for disciplining attorneys licensed in New York State. *See United States v. Cutler,* 58 F.3d 825, 840 (2d Cir.1995) (stating that the state licensing consequences of an attorney's conviction is for the Appellate Division to address); *United States v. Pastore,* 537 F.2d 675, 684 (2d Cir.1976) (Lumbard, J., concurring) ("The grant of the right to practice law is primarily the responsibility of the state."). In addition, there is no evidence that the government had any intention to intercede in the state disciplinary proceedings. The federal plea resolved the case against Clayton. The Court finds no case to support the defendant's position that an actual conflict exists as a result of trial counsel's unresolved disciplinary proceedings and the defendant provides none. The Court

notes that ultimately, the Appellate Division sanctioned Clayton with a public censure.

Finally, the defendant places much emphasis on the Court's statement to the parties before the beginning of the evidentiary hearing on the motion for a new trial:

This is a very interesting case in that no one told the court about this. That is the most interesting point of all. Mr. Clayton didn't tell the Court. Mr. Lato didn't tell the Court. Nobody told the Court. That is very important because if someone had done this, the Court would have held what is known as a *Curcio* hearing and strongly advised Mr. Peterson to get another lawyer. When I say strongly, I would practically tell Mr. Peterson to get another lawyer. He could say to me: No, I have a right to counsel of my choice and continue on. But at least I would have explored this.

6/5/02 at 5. Yet, that same day, the Court also stated that Clayton's conviction did not appear to create an actual conflict and that the only possible conflict could be a financial one. *Id.* at 7–8.

Based upon the foregoing, the Court finds that the interests of Clayton and the defendant did not diverge with respect to any material factual or legal issue, or to any trial strategy during the representation. Accordingly, the Court finds that Clayton did not have an actual conflict of interest during his representation of the defendant.

### 5. The Potential Conflict of Interest

■ "[C]laims of counsel's conflict of interest that do not qualify as *per se* or actual are ordinarily treated as 'potential' conflicts." *Armienti v. United States,* 234 F.3d 820, 824 (2d Cir.2000). In order to prevail on a potential conflict, a defendant "must establish both [1] that counsel's conduct fell below an objective standard of reasonableness and [2] that but for this deficient conduct, the result of the trial would have been different...." *Id.* (citing *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The defendant has established neither element.

As to the standard of reasonableness, the defendant must show that the attorney committed errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. A district court must engage in a "highly deferential" review of the attorney's conduct and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. at 2065. A district court, rather than grade counsel's performance, limits itself to determining "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process...." *Id.* at 696, 104 S.Ct. at 2069.

In support of his motion, the defendant points to seven instances of "ineffectiveness" that he claims necessitates a finding of ineffective assistance of counsel: (1) Clayton failed to advise the defendant of the possibility and desirability of a plea; (2) Clayton failed to pursue a Rule 29 motion; (3) Clayton failed to respond to the government's written application for a Pinkerton instruction on the Section 924(c) counts; (4) Clayton failed to object to police testimony that the defendant had not explained how he lost control over his gun; (5) Clayton failed to properly prepare for his cross-examinations; (6) Clayton failed to adequately prepare his character witnesses; and (7) Clayton was intoxicated at times during the trial. The Court will address these contentions separately.

## a. The Plea Discussions

██ Effective assistance of counsel requires a defense attorney to provide her client with the benefit of counsel's professional advice concerning the "crucial decision" whether to plead guilty or go to trial. *Boria v. Keane*, 99 F.3d 492, 496–497 (2d Cir.1996). The failure to communicate a plea offer or to provide adequate advice about a plea offer constitutes substandard performance. *See id.* at 496–498. Adequate advice in this context means defense counsel "should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir.2000) (citations omitted).

██ As stated above, the Court finds that Clayton advised the defendant of all the plea offers from the state and the federal governments. Also, Clayton reviewed the applicable statutes with the defendant before he was indicted and explained to him that in a worst case situation he could be sentenced to life if convicted of the two Section 924(c) counts and that he faced no less than ten years if convicted on one Section 924(c) count. Further, Clayton and the defendant reviewed the strengths and weaknesses of the case; the defendant knew that the case against him was built largely on accomplice testimony and circumstantial evidence; the defendant knew that the charges against him were serious crimes involving extortion and multiple arsons; and the defendant was told and knew that any plea would involve incarceration. Based upon the foregoing, the Court finds that Clayton's conduct during the plea discussions was appropriate and did not fall below an objective standard of reasonableness.

Moreover, even if Clayton did not communicate all the plea offers, the defendant is unable to show that he would have accepted any plea offer involving a term of incarceration. *See Purdy*, 208 F.3d at 49 (stating that a defendant must show that she would have accepted the plea offer to show prejudice for counsel's failure to properly consider or explain a plea offer). From the inception of the case, as he had an absolute right to do, the defendant proclaimed his innocence, refused all pleas involving any incarceration and was resolved to go to trial. The defendant always told his family and friends that he was innocent. *See Cullen v. United States*, 194 F.3d 401, 407 (2d Cir.1999) (noting that a defendant's insistence on his innocence is a factor relevant to whether he would have pleaded guilty). The defendant knew that he was charged with serious crimes involving extortion and multiple arsons and he knew if convicted of all counts in the indictment that he faced a potential life sentence. The defendant knew that the case against him was built largely on accomplice testimony and circumstantial evidence. The government's case was not based on independent eyewitnesses, non-accomplice witnesses or a confession. Fully aware of all the evidence against him and that any type of plea would involve incarceration, the defendant chose to take his chances at a trial.

The Court finds that the first time that the defendant may have been interested in discussing a plea was when, within one hour of the verdict, his additional attorney Little contacted Lato to discuss the defendant's potential cooperation concerning price fixing in the liquor industry. Now, post-conviction and facing a potential life sentence, the defendant asserts that he would have negotiated a pre-conviction plea. However, there is no doubt that during the course of the state and federal investigations and the post-indictment and pre-trial era he was in fact not willing to

plead guilty and serve a jail sentence "for something that he did not do".

### b. The Rule 29 Motion

The defendant argues that Clayton's statement to the Court that he believed that there was no legal basis to challenge counts one through five of the indictment under Rule 29 establishes ineffective assistance of counsel. In particular, the defendant contends that there was a good faith basis to argue that there was: (1) insufficient proof under count one to show that any of the alleged co-conspirators joined in a conspiracy to obtain from the owners of the subject liquor stores their right to compete in the retail liquor business; and (2) insufficient proof in the extortion charge in count two to show that the defendant instilled or exploited an existing fear over the subject liquor store owners. Also, the defendant contends that Clayton failed to advance any argument at trial that the 1991 shooting preceded the conspiratorial agreement. Analysis under Rule 29 precedent reveals that the defendant's arguments lack merit.

Under Rule 29, a district court "shall order the entry of judgment of acquittal ... if the evidence is insufficient to sustain a conviction of [any charged] offense or offenses." Fed.R.Crim.P. 29(a). A district court must decide whether, based on all of the relevant evidence, a rational juror "might fairly conclude guilt beyond a reasonable doubt...." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984) (internal quotation marks and citations omitted). A district court must draw all reasonable inferences in favor of the government, *see id.* at 865, and all issues of credibility in favor of the jury's verdict. *See United States v. Weiss*, 930 F.2d 185, 191 (2d Cir.1991). A defendant challenging the sufficiency of evidence under Rule 29 must show that, "viewing the evidence in the light most favorable to the government, ... no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir.1997) (internal quotation marks and citations omitted).

Considering the evidence in the light most favorable to the government, the evidence at trial was clearly sufficient to prove that at least one co-conspirator joined in a conspiracy to obtain from the owners of the subject liquor stores their right to compete in the liquor business. In particular, Jesse Hart, a co-conspirator, testified that the defendant directed him to burn down Bottles & Cases and Bottle Bargains because they were "cutting" into the defendant's business. *See* Trial Transcript at 627–628. *See also Peterson*, 190 F.Supp.2d at 358.

Also, the evidence at trial established all the elements of the extortion charge. The defendant argues that there was insufficient proof to establish he instilled or exploited an existing fear in the liquor store owners. However, a rational juror could have found, beyond a reasonable doubt, that the liquor store owners reasonably feared economic loss, or for that matter physical harm, if they did not raise the prices of their liquor after the defendant and his co-conspirators fire bombed their stores. *See United States v. Capo*, 817 F.2d 947, 951 (2d Cir.1987) (stating that the element of fear under the Hobbs Act can be satisfied by placing the victim in the fear of economic loss). A court must consider the absence or presence of fear of economic loss from the perspective of the victim, not the extortionist. *Id.* The proof must show that the victim reasonably believed: "[1] that the defendant had the power to harm the victim; and [2] that the defendant would exploit that power to the victim's detriment." *Id.* In this case, the arsons estab-

lish that the defendant had the power to harm the victims and would exploit that power to their detriment.

■ As to Clayton's failure to challenge the admissibility of the 1991 shooting during the trial because it allegedly came before the conspiratorial agreement, the defendant fails to show how the exclusion of this evidence impacts the sufficiency of counts one through five. Also, Clayton challenged the admissibility of the 1991 shooting in a pre-trial motion. Nevertheless, even if Clayton objected at trial to the admissibility of the 1991 shooting on the ground that it took place prior to the conspiratorial agreement, the evidence could have been admissible as other crimes under Rule 404 of the Federal Rules of Evidence. *See United States v. Diaz,* 878 F.2d 608, 615–616 (2d Cir.1989) (permitting the admission of evidence—probative of the conspiracy—that occurred before the charged conspiracy).

In the instant case, the 1991 shooting involved one of the same liquor stores damaged in the 1995 arsons, namely Bottles & Cases and both incidents involved the same owners of Bottles & Cases. Also, Bottle Bargains, the second liquor store damaged in the arson, was owned by the son of the owners of Bottles & Cases. As such, the 1991 shooting was highly probative of the defendant's motive, intent and plan to commit the arsons in 1995 and was not outweighed by any danger of unfair prejudice. *See United States v. Montour,* 944 F.2d 1019, 1026 (2d Cir.1991) ("If an act is relevant to the alleged conspiracy when viewed in light of all the evidence, it should not be stricken."). Further, the 1991 shooting "completed the story" of the charged conspiracy to deprive the owners of the subject liquor stores of competing for business in the retail liquor industry. *See Diaz,* 878 F.2d at 615–616 (" 'Other crimes' evidence may be admitted to complete the story of the crimes charged.")

(citing *United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986) and *United States v. Ortiz,* 857 F.2d 900, 903 (2d Cir.1988)).

Because the grounds set forth by the defendant for granting a Rule 29 motion have no merit, they provide no basis for a finding of ineffective assistance of counsel. *See United States v. Arena,* 180 F.3d 380, 396 (2d Cir.1999) ("Failure to make a meritless argument does not amount to ineffective assistance.").

#### c. The Remaining Grounds

In a footnote on the second to last page of his trial memorandum, the defendant raises the following points of "ineffectiveness": (1) Clayton failed to respond to the government's written application for a Pinkerton instruction on the Section 924(c) counts; (2) Clayton failed to object to police testimony that the defendant had not explained how he lost control over his gun; (3) Clayton failed to properly prepare for his cross-examinations; and (4) Clayton failed to adequately prepare for his character witnesses. A review of each of these claims reveals that Clayton's performance was not deficient, nor has he shown a reasonable probability that, but for Clayton's alleged unprofessional errors, the result of the trial would have been different. *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064. Finally, the defendant alleges that Clayton was intoxicated during the trial. At the hearing, it was established that there was no evidence to support this allegation.

■ Having viewed Clayton's conduct during the course of his representation, the Court cannot state that his conduct fell below the standard of reasonableness so as to establish ineffective assistance of counsel. At the beginning of his representation, Clayton successfully advised the defendant during the course of the state investigation. He advised the defendant

that he should not testify in the grand jury and wait for the state to make its case against him. This was proper advise considering that the evidence against the defendant consisted of uncorroborated accomplice testimony which was legally insufficient under New York State law.

Also, Clayton spent each night during the trial with the defendant at his office discussing strategy. Further, Clayton was with the defendant on the weekend preparing his closing argument. Having viewed Clayton's representation of the defendant prior to and during the trial, his conduct was appropriate and did not fall below the standard of reasonableness. Clayton was prepared during the trial and represented his client in the manner of an experienced criminal defense lawyer, which he is. All this leads to the Court's conclusion that Clayton's conduct did not fall below an objective standard of reasonableness.

Assuming, arguendo that Clayton's conduct fell below an objective standard of reasonableness, the defendant has not shown any prejudice. In addition to Clayton, the defendant had the benefit of attorney Edward Little—a former federal prosecutor in the Southern District of New York—as a "consultant" for the two week period before and during trial. Little gave the defendant and his son suggestions during the trial to give to Clayton; prepared the motion to suppress evidence from the shooting incident at Bottles & Cases in 1991; was present some of the days during the trial to assist with the defense; and spoke with Clayton during breaks in the trial and discussed trial strategy. In essence, the defendant had the benefit of two attorneys at his trial. With Clayton and Little both working on the case, the Court cannot state that but for Clayton's alleged deficient conduct, the result of the trial would have been different. Accordingly,

the defendant's claim of ineffective assistance of counsel is without merit.

## III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the defendant's motion for a new trial based upon newly discovered evidence is **DENIED;** and it is further

**ORDERED,** that the parties are directed to appear for sentencing on January 17, 2002 at 3 p.m.

**SO ORDERED.**